**UNITED STATES of America ex rel. Raymond M. GILLIARD, Petitioner,**

**v.**

**Hon. J. E. LaVALLEE, Superintendent, Clinton Correctional Facility, Dannemora, New York, Respondent.**

**No. 72 Civ. 4569 (WCC).**

United States District Court, S. D. New York.

May 7, 1974.

John E. LeMoult, Karpatkin, Ohrenstein & Pollet, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen., Albany, N. Y., for respondent.

## MEMORANDUM

CONNER, District Judge:

Raymond M. Gilliard, currently incarcerated in the Great Meadow Correctional Institute, Comstock, New York, petitions this Court for a writ of habeas corpus. On June 17, 1968 he was sentenced by Justice John M. Murtagh of the Supreme Court of the State of New York, New York County, to prison terms of 40 to 60 years, after a jury trial in which he was convicted of all 27 counts of an indictment charging him with robbery, larceny, rape, assault, sodomy, burglary and possession of dangerous weapons. On March 1, 1971 the Appellate Division of the New York Supreme Court, First Department, affirmed without opinion. People v. Gilliard, 36 A.D.2d 794, 318 N.Y.S.2d 681 (1971). On May 20, 1971, leave to appeal to the New York Court of Appeals was denied (Burke, J.).

Thus, having exhausted his state remedies, petitioner properly invokes the jurisdiction of this Court.

## I.

The two incidents which led to petitioner's prosecution and conviction both occurred within the three-day period August 12-14, 1967. At about 10:00 p. m. on August 12, as Ted Greene, Barbara Keating and Sam Gerber were entering Greene's apartment on East 6th Street in Manhattan, petitioner and three other men forced their way in, announcing "this is a robbery". Once inside, one of the men drew a knife while the others blocked the door by placing the refrigerator in front of it. They then proceeded first to blindfold and gag and then to rob their victims. Shortly thereafter, Miss Keating's blindfold was removed and each of the men raped her. While this was transpiring, Cynthia Brucksch came to the apartment. Miss Keating implored petitioner to leave Miss Brucksch alone because of her heart condition (Tr. 634). But, in spite of her entreaties, petitioner forced Miss Brucksch at knifepoint to disrobe and raped her. (Tr. 679-680). Thereafter, the other men also raped her.

At about five o'clock in the morning, following their use of drugs, the perpetrators became passive and friendly, and allowed Greene out of the apartment ostensibly to take Miss Keating to the hospital. However, after leaving the apartment, Greene and Keating did not go to the hospital because they were afraid the police would learn what had transpired and seek to enter the apartment. Petitioner had threatened them that this would result in Gerber's death. The men finally left the apartment at about 7:30 on the morning of August 13th. The police were notified late that morning.

During the afternoon of August 13, Keating and Greene gave Detective Matarazzo a description of the assailants and looked through the police photograph files, simultaneously identifying petitioner from one photograph (Wade Tr. 32-32-D). Miss Brucksch also gave descriptions and viewed photographs that day and likewise identified petitioner (Wade Tr. 164-66).

On August 21, 1967, Detective Matarazzo called Greene and asked whether he could "come down and look at some people". He went down to the police station and viewed three men, one at a time, through a one-way mirror. One of the men he picked out was petitioner (Wade Tr. 35-36).

On August 25, 1967 Greene, Keating and Brucksch went down to the Criminal Court, Part 1-A and sat in the back of the courtroom. There they promptly identified the defendants walking in the front of the courtroom.

## II.

On August 14, 1967, the day after the first incident, Gene Mundie and Karen Trimble drove Pauline Turner home from the airport. When they entered her apartment building on East 11th Street in Manhattan at about 10:00 p. m., four men entered with them and forced their way into her apartment. Mrs. Turner became very upset by their behavior, and when she protested, she was assaulted. Mundie was then blindfolded, gagged and bound with telephone wires removed from the apartment. He was assaulted numerous times and kicked while lying on the floor. Mrs. Turner was blindfolded and then repeatedly raped and sodomized. Eventually, her blindfold was removed and she was attacked with a knife.

Miss Trimble, who was not blindfolded, was beaten until she agreed to remove her clothes, and then raped by all of the men.

The perpetrators left about 12:00 a. m., and the police were summoned.

On August 15, Trimble, Mundie and Turner gave descriptions of the perpetrators and looked through the police photograph file. Trimble and Turner mistakenly identified one John Moses, but Mundie did not agree. Later that night

they were called again to headquarters to view Moses at a "show-up" through a one-way mirror. They all identified him as one of their assailants.

On August 20, Miss Trimble was called back to the precinct and was brought before the one-way mirror again. This time she picked out the petitioner and told Detective Matarazzo that Moses was the wrong man (Wade Tr. 211, 215).

On August 21, Mundie went down to the precinct and was brought before the one-way mirror again; this time he immediately picked out petitioner, stating that he had been mistaken before (Wade Tr. 244, 257–60, 279–81).

On August 25, Trimble, Turner and Mundie were sitting in the back of the courtroom in the Criminal Court, Part 1–A. When Miss Trimble saw six people, including Moses and petitioner, walk across the front of the court (Wade Tr. 209–11), she again identified petitioner. When Mrs. Turner saw petitioner and Moses standing together in court, she acknowledged her mistake as to Moses (Wade Tr. 314, 326).

Petitioner and William Billups, Ralph Thompson and Cecil Price were subsequently indicted for various acts of robbery, larceny, rape, sodomy, assault and burglary. Prior to the trial, Price pleaded guilty and agreed to testify for the prosecution. During the trial, Thompson withdrew his plea of not guilty and pleaded guilty to all counts of the indictment (Tr. 697–722). Petitioner and Billups were both convicted on all 27 counts of the indictment.

### III.

In this Court, petitioner seeks a new trial on the grounds that: 1) he was not informed of the charges against him, and was arrested without probable cause; 2) Detective Matarazzo unlawfully testified in the capacity of an arresting officer; 3) the complaining witness' in-court identifications were tainted by il-

legal out-of-court identifications; and 4) he was improperly denied the transcript of the pretrial identification hearing.

■ Petitioner's first claim is in essence a claim of unlawful arrest. This claim is not properly cognizable in a federal habeas corpus proceeding. Hachey v. Maine, 453 F.2d 369 (1st Cir. 1972).

■ The general rule is that habeas corpus does not lie to set aside a conviction in a case where there was an illegal arrest, unless the arrest in some way deprived the applicant of a fair trial. Edwards v. Swenson, 454 F.2d 1106, 1111 (8th Cir.), cert. denied, 406 U.S. 909, 92 S.Ct. 1619, 31 L.Ed.2d 820 (1972); Brooks v. Smith, 429 F.2d 1281, 1282 (5th Cir. 1970); Boblit v. Warden, Maryland Penitentiary, 350 F.Supp. 768 (D.Md.1972); Edwards v. Beto, 329 F.Supp. 1035, 1036 (N.D.Tex.1970).

The typical example of such a situation is where evidence which is the fruit of an illegal arrest results in conviction. There is no claim here that any evidence was seized from petitioner at the time of his arrest. In fact, there is nothing in the transcript to indicate that the procedure of petitioner's arrest had any effect whatsoever on his trial.

■ Petitioner's second claim is in effect a reiteration of the unlawful arrest claim, and also a claim for deprivation of rights because of the denial of the pretrial transcript. He contends that the transcript would have enabled him more effectively to cross-examine Detective Matarazzo. Although there are minor inconsistencies in Detective Matarazzo's testimony, it was introduced merely as background and the inconsistencies could in no way have affected the guilt-determining process. Accordingly, this contention is without merit.

Petitioner's third claim is a challenge to the out-of-court identification procedures of August 21 and 25.[1] It is un-

---

1. Petitioner's contention that the trial judge wrongfully ruled that the pretrial identifications made August 25, at the arraignment, were admissible is clearly unfounded. In

fact, Judge Murtagh specifically excluded all such testimony. He ruled that:

"[A]s counsel for the defendants were not present at the pre-court identifications, the

disputed that no attorney was present at either of these "show-ups" and that petitioner was never advised of his right to have an attorney present.[2] Consequently, on March 6, 1968, prior to the commencement of trial, petitioner's assigned counsel moved to preclude all identification testimony on the ground that any in-court identification would be impermissibly infected by the illegal out-of-court procedures. The court promptly commenced a Wade hearing which lasted several days. During the course of this hearing six of the victims positively identified the petitioner (Wade Tr. 19–21; 117, 118, 129; 153; 183–84; 239; 306–07). All six of these eye-witnesses had extraordinary opportunity to observe their assailant. They all testified that they were held captive by him for periods ranging from two to seven hours, and viewed him at close range for periods ranging from 20 minutes in one case[3] to six hours in two others. Three of the victims testified that they viewed petitioner during the course of being raped by him. Petitioner's counsel vigorously cross-examined each eye-witness.

On March 12, 1968 the Court found that the prosecution had established that the in-court identifications were not tainted by the improper out-of-court identification procedures and accordingly denied the motion[4] as to such testimony.

The Court stated:

"Based on the time available for observations, the time in which the observations were in fact made and the circumstances under which the observations were made, the Court finds that the in-court identifications are based on the observations made at the time of the commission of the crimes independently of any pre-court identifications.

"The in-court identifications have a source independent of any identifications or observations made subsequently to the time of the crimes.

"There is no evidence that the identifications of any witness are based on the identification of other witnesses." (Wade Tr. 440–41)

It is well settled that where the State Court has conducted a full and

---

court will not permit the introduction of evidence of the pre-court identification at the instance of the People. Defendants, on the other hand, may introduce evidence as to the pre-trial identifications on the question of the accuracy and the validity of the in-court identifications." (Tr. 441–42)

2. It is clear that the pre-court identification procedures were unnecessarily suggestive and for that reason, evidence of the identifications were ruled inadmissible at trial. This however, does not mandate a determination that the in-court identification was infected by the out-of-court procedures. In United States v. Wade, 388 U.S. 218, 242, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court found that it is appropriate to hold a hearing to determine whether an in-court identification has an independent source, or whether, in any event, the introduction of the evidence was harmless error.

3. Gene Mundie, who was blindfolded most of the time, testified that the only one whose identity he could be absolutely sure of was petitioner. Tr. 817; Wade Tr. 246.

4. *Supra note 1.* The fact that three of the victims initially identified John Moses as the

man who they later identified as petitioner does not irreparably taint the identification. Recently, in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), the Supreme Court defined the factors to be considered in evaluating the likelihood of misidentification to include:

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

The only point in issue here is the accuracy of the first identification. It is undisputed that three of the witnesses thought that John Moses was one of the assailants. It is also true however, that after a lengthy and thorough hearing at which those witnesses testified that they told the detective of their mistake immediately upon seeing petitioner (Wade Tr. 211, 260, 280, 326), the trial judge found the identifications to be valid. See *supra* at Tr. 5–6.

fair evidentiary hearing with express findings of fact, the district court may "and ordinarily should, accept the facts as found in the hearing". Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963). This principle was codified in 28 U.S.C. § 2254(d), which provides in pertinent part that in a habeas corpus proceeding the determination of fact of the State Court "shall be presumed to be correct", unless the "factual determination is not fairly supported by the record". Here, there was a full and fair hearing by the State Court and this Court must therefore accept Judge Murtagh's finding that the in-court identification had an independent basis. United States ex rel. Fein v. Deegan, 410 F.2d 13, 17 (2d Cir.), cert. denied, 395 U.S. 935, 89 S.Ct. 1997, 23 L.Ed.2d 450 (1969). See United States ex rel. Johnson v. Department of Correctional Services, 461 F.2d 956, 961 (2d Cir. 1972). Indeed, in view of the circumstances which gave rise to the eyewitness testimony and in-court identifications, it is clear that there was more than ample support for Judge Murtagh's conclusion that:

"[T]he evidence in the form of in-court identifications has been come at by means sufficiently distinguishable from the pre-court identifications to be purged of any primary taint." (Wade Tr. 441)

Petitioner's last claim is his most substantial one. Judge Murtagh was clearly in error when he denied petitioner a copy of the transcript of the Wade hearing for the stated reason that:

"It is not the kind of concession that is enjoyed, except in rare instances by those who can afford them . . ." (Tr. 591)

The New York Court of Appeals, more than a year before petitioner's request, in People v. Montgomery, 18 N.Y.2d 993, 994, 278 N.Y.S.2d 226, 227, 224 N.E.2d 730, 731 (1966), ruled:

"[T]he State cannot, consonant with the equal protection clause of the State and Federal Constitutions, deny a defendant prior to trial, access to a transcript of a preliminary hearing because of his inability to pay." (Citations omitted)

Indeed, this ruling was merely an amplification of the well-settled principle, first enunciated in Griffin v. Illinois, 351 U.S. 12, 17–18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956), that:

"In criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color. Plainly, the ability to pay costs in advance bears no rational relationship to a defendant's guilt or innocence . . . ."

See also, Mayer v. Chicago, 404 U.S. 189, 193, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971).

In Roberts v. LaVallee, 389 U.S. 40, 42, 88 S.Ct. 194, 196, 19 L.Ed.2d 41 (1967), the Supreme Court applied this principle to a case in which a petitioner was denied a free copy of a preliminary hearing transcript, stating:

"Our decisions for more than a decade now have made clear that differences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution. See, e. g., Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Only last Term, in Long v. District Court of Iowa, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966), we reiterated the statement first made in Smith v. Bennett, 365 U.S. 708, 709, 81 S.Ct. 895, 896, 6 L.Ed.2d 39 (1961), that 'to interpose any financial consideration between an indigent prisoner of the State and his exercise of a state right to sue for his liberty is to deny that prisoner the equal protection of the laws.'"

Similarly, in Britt v. North Carolina, 404 U.S. 226, 228, 92 S.Ct. 431, 434, 30 L.Ed.2d 400 (1971), the Supreme Court ruled that:

"Our cases have consistently recognized the value to a defendant of a

transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case."

In *Britt*, the Court rejected the suggestion that there is no prejudice when the trial follows the prior proceeding closely and petitioner and counsel may be presumed to recollect the facts. *Supra* at 229; United States ex rel. Wilson v. McMann, 408 F.2d 896 (2d Cir. 1969).

The State here makes much of the argument that petitioner's request was validly denied since it was not timely made, as required by People v. Montgomery, *supra*, 18 N.Y.2d at 994–995, 278 N.Y.S.2d 226, 224 N.E.2d 730, to prevent disruption of the trial. See People v. Matz, 23 N.Y.2d 196, 199, 295 N.Y.S.2d 918, 243 N.E.2d 140 (1968). It is questionable whether a request for the minutes of the Wade hearing was made at the first available moment. It is true that, at the time of the motion for a Wade hearing, counsel requested the minutes of "these proceedings" (Wade Tr. 10–11). And when counsel later requested "a daily transcript of the record" (Tr. 11), Judge Murtagh's remarks in ruling upon that request made it apparent that he intended to rule only on the propriety of furnishing a *daily* transcript (Wade Tr. 467). However, almost immediately upon petitioner's assumption of his own defense (Tr. 556), he clearly requested the minutes of the Wade hearing (Tr. 590–91).

■ Where a defendant is acting *pro se*, the court should be lenient in determining whether the required showing of need for a transcript has been satisfied. See Gardner v. California, 393 U.S. 367, 369–370, 89 S.Ct. 580, 21 L.Ed. 2d 601 (1969).

■ Thus, the question whether petitioner made a timely and proper application for the minutes is a close one. This Court, however, is satisfied that the denial of the transcript, even if error, was harmless. Chapman v. Cali-

fornia, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The testimony establishing petitioner's guilt was overwhelming. Seven eyewitnesses, including an accomplice, identified petitioner as the principal engineer of the crimes set forth in the indictment.

In addition, there was considerable other evidence linking petitioner with the crimes. Greene testified that a watch, which he described in detail, was taken from him during the August 12–13 incident (Tr. 550–54). Two of the victims of the August 14 incident recognized the watch as the one they saw on petitioner's person during the perpetration of the crimes against them. (Tr. 765, 867). These witnesses also recognized a knife seized by the police as having been in petitioner's possession during the incident (Tr. 798, 867). Trimble testified that she recognized petitioner's voice (Tr. 791).

Moreover, Price, an accomplice to the crimes testified at trial that he was with petitioner when the crimes were committed. He too identified the items in question as being in petitioner's possession during the commission of the crimes (Tr. 924–25). Furthermore, all of the victims testified that they had heard one of the men referred to as "Simba", and Price testified that petitioner was known by this name (Tr. 917).

Against this record, petitioner's claim that the transcript of the Wade hearing would have bolstered his defense is not persuasive. It is true that three witnesses were unsure of petitioner's identity at the outset. However, each of these witnesses positively identified petitioner at the Wade hearing and repeated their identification at trial. Petitioner, armed with the witness' Grand Jury testimony, fully and thoroughly explored the initial misidentification on cross-examination. Thus, based on a thorough review of the transcript of the Wade hearing, this Court is satisfied that there is nothing therein that

**212**

could have further assisted petitioner at trial. United States v. Bamberger, 482 F.2d 166, 168–169 (9th Cir. 1973), cert. denied 414 U.S. 1041, 94 S.Ct. 543, 38 L.Ed.2d 332; United States v. Bueno, 470 F.2d 154 (5th Cir. 1972), cert. denied, 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d 411 (1973).

The petition for a writ of habeas corpus, is therefore denied.

A certificate of probable cause (28 U.S.C. § 2253) will not issue since there are no questions of substance on which the Court of Appeals should rule.

The Court wishes to thank John E. LeMoult, of Karpatkin, Ohrenstein & Pollet, petitioner's assigned counsel, for his excellent presentation on petitioner's behalf.

So ordered.