# BRITT *v.* NORTH CAROLINA

No. 70–5041.   Argued October 14, 1971—Decided December 13, 1971

*Robert G. Bowers* argued the cause and filed a brief for petitioner.

*Christine Y. Denson,* Assistant Attorney General of North Carolina, argued the cause for respondent.   With her on the brief was *Robert Morgan,* Attorney General.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioner's three-day murder trial ended in a mistrial when the jury reported a hopeless deadlock.   A retrial was scheduled for the following month.   In the interim, petitioner filed a motion alleging that he was indigent, and asking for a free transcript of the first trial.   The trial court denied his motion, and the North

Carolina Court of Appeals affirmed, stating that the record of the case did not reveal a sufficient need for the transcript. 8 N. C. App. 262, 174 S. E. 2d 69 (1970). The North Carolina Supreme Court denied certiorari. We granted certiorari to determine whether the rule of *Griffin* v. *Illinois,* 351 U. S. 12 (1956), applies in this context. 401 U. S. 973 (1971). We conclude that it does, but that in the narrow circumstances of this case, no violation of that rule has been shown, and therefore we affirm.

*Griffin* v. *Illinois* and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal.[1] The question here is whether the state court properly determined that the transcript requested in this case was not needed for an effective defense.

In prior cases involving an indigent defendant's claim of right to a free transcript, this Court has identified two factors that are relevant to the determination of need: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript.[2] MR. JUSTICE

---

[1] *Williams* v. *Oklahoma City,* 395 U. S. 458 (1969); *Gardner* v. *California,* 393 U. S. 367 (1969); *Roberts* v. *LaVallee,* 389 U. S. 40 (1967); *Long* v. *District Court of Iowa,* 385 U. S. 192 (1966); *Draper* v. *Washington,* 372 U. S. 487 (1963); *Eskridge* v. *Washington Prison Board,* 357 U. S. 214 (1958); *Griffin* v. *Illinois,* 351 U. S. 12 (1956).

[2] See *Draper* v. *Washington, supra,* at 495–496, and other cases cited n. 1, *supra.*

DOUGLAS suggests that the North Carolina courts refused to order a transcript in this case both because petitioner failed to make a particularized showing of need, and because there were adequate alternative devices available to him.

We agree with the dissenters that there would be serious doubts about the decision below if it rested on petitioner's failure to specify how the transcript might have been useful to him. Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case.[3] As MR. JUSTICE DOUGLAS makes clear, even in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.

But the court below did not use the language of "particularized need." It rested the decision instead on the second factor in the determination of need, that is, the availability of adequate alternatives to a transcript. The second trial was before the same judge, with the same counsel and the same court reporter, and the two trials were only a month apart. In these circumstances, the court suggested that petitioner's memory and that of his counsel should have furnished an adequate substitute for a transcript. In addition, the court pointed to the

---

[3] In *Griffin,* the Court was able to rely on a concession of need by the State, 351 U. S., at 13–14, 16. In subsequent cases the Court has taken judicial notice of the importance of a transcript in a variety of circumstances, see *Eskridge, supra,* at 215; *Gardner, supra,* at 369–370. Most recently in *Long* and *Roberts* the Court simply found it unnecessary to discuss the question, notwithstanding the fact that in *Roberts* Mr. Justice Harlan argued in dissent that petitioner had suggested no use to which the transcript could have been put, 389 U. S., at 43.

fact that petitioner could have called the court reporter to read to the jury the testimony given at the mistrial, in the event that inconsistent testimony was offered at the second trial.

We have repeatedly rejected the suggestion that in order to render effective assistance, counsel must have a perfect memory or keep exhaustive notes of the testimony given at trial.[4] Moreover, we doubt that it would suffice to provide the defendant with limited access to the court reporter during the course of the second trial. That approach was aptly rejected as "too little and too late" in *United States ex rel. Wilson* v. *McMann,* 408 F. 2d 896, 897 (CA2 1969). At oral argument in this case, however, it emerged that petitioner could have obtained from the court reporter far more assistance than that available to the ordinary defendant, or to the defendant in *Wilson.* The trials of this case took place in a small town where, according to petitioner's counsel, the court reporter was a good friend of all the local lawyers and was reporting the second trial. It appears that the reporter would at any time have read back to counsel his notes of the mistrial, well in advance of the second trial, if counsel had simply made an informal request.[5]

---

[4] While trial notes might well provide an adequate substitute for a transcript, the failure to make such notes does not bar an indigent prisoner from claiming the right to a free transcript, *Eskridge, supra,* at 215. As for requiring a prisoner to rely on his memory, this Court rejected that as an alternative to a transcript in *Gardner, supra,* at 369–370, and *Williams, supra,* at 459. Indeed, in *Long* we refused to consider any alternatives suggested by the State, on the ground that in that case a transcript was in fact available and could easily have been furnished. 385 U. S., at 194–195. Whether a transcript is similarly available in this case does not appear from the record.

[5] Tr. of Oral Arg. 12. Cf. *Avery* v. *Alabama,* 308 U. S. 444, 450–452 (1940) (Black, J.).

A defendant who claims the right to a free transcript does not, under our cases, bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight. In this case, however, petitioner has conceded that he had available an informal alternative which appears to be substantially equivalent to a transcript.[6] Accordingly, we cannot conclude that the court below was in error in rejecting his claim.

For these reasons the judgment is                    *Affirmed.*

MR. JUSTICE BLACKMUN concurs in the result, but he would dismiss the petition for certiorari as having been improvidently granted.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

After the State's first murder prosecution of the petitioner ended in a hung jury in November 1969, Britt was retried, convicted, and sentenced to 30 years' imprisonment. During the interim between the two trials, the petitioner made a showing of indigency and asked that the State provide him with a free transcript of the mistrial. The trial court denied his motion despite Britt's contention that because a more affluent defendant could purchase such a transcript as a matter of right a denial of his request would offend the principle of *Griffin* v. *Illinois,* 351 U. S. 12 (1956). On appeal, the North Carolina Court of Appeals was likewise unconvinced by Britt's equal protection claim and affirmed the trial court's refusal to order a free transcript, stating that

---

[6] Cf. *Wade* v. *Wilson,* 396 U. S. 282 (1970), in which no such concession was made. In that case it simply appeared from the record that petitioner might have been able to borrow a transcript from the prosecutor, in light of the fact that he had done so in an earlier proceeding. We remanded the case to permit exploration of that possibility.

(a) the petitioner had not made a particularized showing of need, (b) he had been represented by the same lawyer at both trials, and therefore (c) any suspected inconsistencies in prosecution evidence could have been developed by counsel's putting on the court reporter to read earlier testimony of the first trial. Because I am persuaded by Britt's argument I would reverse the decision of the North Carolina Court of Appeals.

# I

*Griffin* v. *Illinois, supra,* at 19, established the now familiar principle that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." While *Griffin* involved only the provision of a free transcript to an indigent on direct appeal, its underlying principle has achieved broader usage. We have witnessed a steady growth of its applications to other transcript cases,[1] to docketing fees,[2] and to right to counsel.[3]

---

[1] *Wade* v. *Wilson,* 396 U. S. 282 (1970); *Gardner* v. *California,* 393 U. S. 367 (1969); *Roberts* v. *LaVallee,* 389 U. S. 40 (1967); *Long* v. *District Court of Iowa,* 385 U. S. 192 (1966); *Draper* v. *Washington,* 372 U. S. 487 (1963); *Eskridge* v. *Washington Prison Board,* 357 U. S. 214 (1958); *Ross* v. *Schneckloth,* 357 U. S. 575 (1958); *People* v. *Montgomery,* 18 N. Y. 2d 993, 224 N. E. 2d 730 (1966). An indigent's right to a transcript of grand jury testimony in the federal courts is now protected by the Criminal Justice Act of 1964, at least to the extent that any defendant—whether rich or poor—has access thereto. 18 U. S. C. § 3006A (e) (1). In the Second and Seventh Circuits federal defendants have absolute rights to all grand jury minutes. *United States* v. *Youngblood,* 379 F. 2d 365 (CA2 1967); *United States* v. *Amabile,* 395 F. 2d 47, 53 (CA7 1968). And in all other circuits the grand jury testimony of an individual prosecution witness is discoverable under the recent amendments to the Jencks Act. 18 U. S. C. § 3500 (e) (3).

[2] *Boddie* v. *Connecticut,* 401 U. S. 371 (1971); *Smith* v. *Bennett,* 365 U. S. 708 (1961); *Burns* v. *Ohio,* 360 U. S. 252 (1959).

[3] *Anders* v. *California,* 386 U. S. 738 (1967); *Swenson* v. *Bosler,* 386 U. S. 258 (1967); *Douglas* v. *California,* 372 U. S. 353 (1963); see also *Gideon* v. *Wainwright,* 372 U. S. 335 (1963).

Of these applications, *Roberts* v. *LaVallee*, 389 U. S. 40 (1967), is most analogous to the instant circumstances. In *Roberts,* an indigent defendant before trial asked a state court to provide him with a free transcript of a preliminary hearing at which a key state witness had testified. In *Roberts,* as here, no special showing of need was made, the defendant was represented by the same counsel at all times, and the court reporter could have been called to read back previous testimony. *Id.,* at 43. Nonetheless, over the dissent of Mr. Justice Harlan that no prejudice had been shown, *id.,* at 44, we held that withholding the requested transcript was an invalid interposition of a financial consideration between an indigent prisoner and his right to sue for his liberty. *Id.,* at 42.

Here the request was for a mistrial transcript, whereas in *Roberts* a motion had been made for a preliminary hearing transcript. In the ways in which either might be used I can perceive no differences. In both sets of circumstances it would seem that defendants would be interested in better trial preparation and in better positions from which to challenge discrepancies in government witnesses' stories.[4] For both of these purposes a mistrial transcript would be more valuable than a preliminary hearing recording because the former is a virtual dry run of the entire prosecution's case, information which normally is clothed in top secrecy under the prevailing and restrictive rules against a criminal defendant's discovery.

---

[4] These two reasons were offered by the Second Circuit to explain why a mistrial transcript might be useful. *United States ex rel. Wilson* v. *McMann,* 408 F. 2d 896 (CA2 1969). Our discussion in *Roberts* did not suggest any ways in which the transcript of the pretrial hearing might have been useful, although our *per curiam* intimated that perhaps counsel desired to have a check against the testimony of a key witness, *Roberts* v. *LaVallee, supra,* at 41; nor did the Second Circuit's discussion of the issue, *United States ex rel. Roberts* v. *LaVallee,* 373 F. 2d 49 (CA2 1967).

Perhaps for these considerations the Second Circuit has squarely held that indigent state defendants have an absolute right to free transcripts of previous prosecutions ending in hung juries. *United States ex rel. Wilson* v. *McMann*, 408 F. 2d 896 (CA2 1969). As both here and in *Roberts*, Wilson had made no showing of particular need, had been represented by the same lawyer at all times, and could have called the court reporter to read back previous testimony. And, as here, the defendant had requested a mistrial transcript during the interim between the two prosecutions. The Second Circuit considered *Griffin* and *Roberts* controlling.

The North Carolina Court of Appeals, however, has rejected the *Griffin-Roberts-Wilson* cases and sought refuge in the pre-*Roberts* authority of *Nickens* v. *United States*, 116 U. S. App. D. C. 338, 323 F. 2d 808 (1963), which had emphasized, as did the court below, the defendant's failure to articulate a particular need for a transcript, the continuity of defense counsel, and the availability of the court reporter.[5] I thought that these arguments had been found irrelevant for constitutional purposes under *Griffin-Roberts-Wilson*.

## II

The primary rationale offered to support the holding below is that the petitioner failed to make a showing of a particularized need for a mistrial transcript. Presum-

---

[5] *Nickens* v. *United States*, 116 U. S. App. D. C. 338, 323 F. 2d 808 (1963), was decided before the full development of our transcript cases. The majority opinion in *Nickens* gave the other issues in the case more plenary consideration. Judge Wright concurred in the majority's view that no transcript had been required but only because he believed a motion to obtain a transcript had not been properly raised. *Id.*, at 345, 323 F. 2d, at 815. Also cited in the North Carolina opinion was *Forsberg* v. *United States*, 351 F. 2d 242 (CA9 1965), also a pre-*Roberts* opinion, which relied solely on *Nickens* in denying a mistrial transcript to an indigent. *Id.*, at 248.

ably this rationale flows from the legitimate state interest in avoiding needless fiscal outlays. In related contexts we have rejected the notion that an impoverished accused in the federal courts may be refused a transcript simply because his lawyer is unable to articulate the very subtleties which might be buried in the document he seeks. For example, in *Hardy v. United States,* 375 U. S. 277 (1964), we required courts of appeals to order for indigent criminal appellants complete trial transcripts even for the preliminary purpose of determining whether their appeals might present nonfrivolous questions for review and therefore entitle them to *in forma pauperis* relief pursuant to 28 U. S. C. § 1915. We rejected the then-prevailing view that a full transcript for such purposes could only be provided for those appellants able to demonstrate a particular need for all parts thereof. The concurring opinion of four Justices concerning the value of a transcript in appellate advocacy is applicable to the analogous use of a mistrial transcript in formulating retrial strategy:

> "As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcript, through which his trained fingers may leaf and his trained eyes may roam in search of an error, a lead to an error, or even a basis upon which to urge a change in an established and hitherto accepted principle of law. . . .
>
> ". . . No responsible retained lawyer who represents a defendant at trial will rely exclusively on his memory (even as supplemented by trial notes) in composing a list of possible trial errors which delimit his appeal." *Hardy v. United States, supra,* at 288 (Goldberg, J., concurring).

Similarly, while counsel is studying mistrial minutes, the precise words used by a witness might trigger mental

processes resulting in legitimate defense strategies which otherwise might be overlooked. Such spontaneity can hardly be forecast and articulated in advance in terms of special or particularized need.

It is unnecessary, however, to speculate as to how often helpful subtleties in mistrial transcripts might actually be found because, as a more general matter, at least two compelling interests would be routinely served by providing paupers with free transcripts, even in cases where counsel were unable to specify the precise nature of the benefits of such discovery. As mentioned earlier, one such interest is that of effective trial preparation by counsel (who may realize that his counterpart, the prosecutor, will employ a similar document supplied at the State's expense during his own trial preparation). The other interest is that of anticipating possible discrepancies in prosecution witnesses' statements and in being prepared immediately to challenge such contradictions. See *Wilson, supra,* at 897. Because wealthier defendants tend to purchase transcripts as a matter of course simply on the strength of these recurring interests, it would appear that these benefits are ordinarily worth the fiscal burden of providing the documents regardless of how the cost of reproducing minutes may be distributed.[6]

When viewed in the broader context of a defendant's complete lack of criminal discovery procedures, the importance of a mistrial transcript becomes even clearer. Many commentators have criticized the persistent common-law prohibition against discovery by criminal de-

---

[6] Professor Robert Keeton notes that in civil cases involving large amounts of money it is standard practice for lawyers to place "a standing order with the reporter for 'daily copy' of the trial proceedings." R. Keeton, Trial Tactics and Methods 104 (1954). Presumably when wealthy clients are haled before criminal courts rather than before civil ones, their attorneys likewise place such standing orders.

fendants, characterizing present systems as "sporting theories of justice" and complaining of the vast advantage enjoyed by the prosecution in the marshaling of evidence.[7] While some States and the federal system have moved to liberalize defendants' discovery priv-

[7] The excessive disparity between the State and the accused in their respective investigative resources, and the common law's prohibition against discovery have been summarized as follows by one commentator:

"[T]he law enforcement agency is often at the scene of the crime shortly after its commission. While at the scene, the police have better access to witnesses with fresher recollections. They are authorized to confiscate removable evidence. In addition, the financial and investigatory resources of law enforcement agencies permit an extensive analysis of all relevant evidence.

"The defendant has the option of hiring a private investigator. However, the investigator will probably get to the scene long after the occurrence of the crime and after the police have made their investigation and removed all relevant physical evidence. The defendant's investigator may have difficulty viewing the scene if it is on private property. Witnesses may be less accessible; their recollections will probably be less precise. Indeed they may choose not to cooperate at all with the defendant's investigator. However, it may all be irrelevant if, as is often the case, the defendant is unable to afford an investigator or is incarcerated pending trial.

"The defendant is helpless to cope with the uncooperative witness while the prosecutor has numerous means to compel testimony. First, there is the possibility of [a] coroner's inquest or a preliminary hearing. And if the prosecution prefers not to have the defense present, some jurisdictions allow the prosecution to take testimony while the defendant and his attorney are excluded. The uncooperative witness can be subpoenaed to appear before the grand jury and required to testify, again without the presence of the defense. The defense cannot, usually, discover the grand jury minutes.

"Many states require that the defendant give notice of intended alibi or insanity defenses. The prosecution's burden, in bringing a charge, in contrast, has been substantially lessened. Mere recitation of the statute may be a sufficient pleading of the charge. Amendments to the indictment or information are liberally allowed; duplicity and variances are no longer serious defects. Liberal

ileges,[8] the common-law prohibition with limited exceptions still applies in North Carolina.[9] No criminal analogue has been enacted to complement the State's more modern and comprehensive rules of civil discovery.[10] Instead, its judiciary has continued to apply the common law's flat ban and as recently as 1964 has reaffirmed that policy. In *State* v. *Goldberg*, 261 N. C. 181, 134 S. E.

---

pleading rules deprive the defendant of effective notice of the circumstances of the offense." Norton, Discovery in the Criminal Process, 61 J. Crim. L. C. & P. S. 11, 13–14 (1970).

See generally Handzel, Criminal Law: Pre-Trial Discovery—The Right of an Indigent's Counsel to Inspect Police Reports, 14 St. Louis U. L. J. 310 (1969); Moore, Criminal Discovery, 19 Hastings L. J. 865 (1968); A State Statute to Liberalize Criminal Discovery, 4 Harv. J. Legis. 105 (1967). Comment, Disclosure and Discovery in Criminal Cases: Where Are We Headed?, 6 Duquesne U. L. Rev. 41 (1967); Golden & Palik, Bibliography: Criminal Discovery, 5 Tulsa L. J. 207 (1968); Symposium: Discovery in Federal Criminal Cases, 33 F. R. D. 47 (1963); Brennan, Criminal Prosecution: Sporting Event or Quest For Truth?, 1963 Wash. U. L. Q. 279.

[8] See Fed. Rules Crim. Proc. 15–17. See also Note, Discovery Procedures Under New York's New Criminal Procedure Law, 38 Brooklyn L. Rev. 164 (1971); Right of Accused in State Courts to Inspection or Disclosure of Evidence in Possession of Prosecution, 7 A. L. R. 3d 8 (1966).

[9] Statutory exceptions to the common-law ban in North Carolina may be found at N. C. Gen. Stat. § 8–74 (1969) (depositions of witnesses unable to attend trial); and at § 15–155.4 (Supp. 1969). The latter provision was enacted in 1967 and permits limited discovery of prosecution evidence where (a) good cause is shown for discovery, (b) the prosecution intends to use the evidence at trial. The latter condition would effectively prevent defendants' discovery of evidence which might be favorable. The only reported decisions considering this addition are those in *State* v. *Macon*, 276 N. C. 466, 173 S. E. 2d 286 (1970), affirming 6 N. C. App. 245, 170 S. E. 2d 144 (1969), upholding the refusal of a trial court to permit an accused's inspection of notes which had been made by a specified police officer during the accused's interrogation.

[10] N. C. Gen. Stat. c. 1A (1969).

2d 334 (1964), the North Carolina Supreme Court affirmed a trial court's refusal to order the State Bureau of Investigation to permit a defendant to inspect certain documents in its files. In explaining the ancient rule the court approved the language of Chief Justice Vanderbilt's well-known view of criminal discovery in the leading case of *State* v. *Tune,* 13 N. J. 203, 98 A. 2d 881 (1953):

> " 'In criminal proceedings long experience has taught the courts that often discovery will lead not to honest fact-finding, but on the contrary to perjury and the suppression of evidence. Thus the criminal who is aware of the whole case against him will often procure perjured testimony in order to set up a false defense. . . . Another result of full discovery would be that the criminal defendant who is informed of the names of all the State's witnesses may take steps to bribe or frighten them into giving perjured testimony or into absenting themselves so that they are unavailable to testify. Moreover, many witnesses, if they know that the defendant will have knowledge of their names prior to trial, will be reluctant to come forward with information during the investigation of the crime. . . . All these dangers are more inherent in criminal proceedings where the defendant has much more at stake, often his own life, than in civil proceedings. The presence of perjury in criminal proceedings today is extensive despite the efforts of the courts to eradicate it and constitutes a very serious threat to the administration of criminal justice and thus to the welfare of the country as a whole. . . . To permit unqualified disclosure of all statements and information in the hands of the State would go far beyond what is required in civil cases; it would defeat the very ends of justice.' "

*State* v. *Goldberg, supra,* at 192, 134 S. E. 2d, at 341.[11]

North Carolina's presentation of an anti-discovery policy is evidenced not only in its reluctance to enact a modern code to permit such procedures but also in its occasional one-sided legislation concerning related matters. For example, while a local prosecutor has an absolute right to inspect the files of the State Bureau of Investigation which pertain to one of his local inquiries, an accused may inspect such evidence only upon court order procured for good cause. See N. C. Gen. Stat. § 114–15 (1966). Even a common-law request for a bill of particulars to clarify an indictment normally does not require a prosecutor to divulge names of his witnesses or the nature of his physical or documentary evidence.[12] N. C. Gen. Stat. § 15–143 (1965); *State* v. *Spence,* 271 N. C. 23, 32, 155 S. E. 2d 802, 809 (1967).[13]

---

[11] The celebrated opinions in *State* v. *Tune,* 13 N. J. 203, 98 A. 2d 881 (1953), contain a vigorous dissent by Justice (now MR. JUSTICE) BRENNAN who expressed regret over the majority's disregard of the successful implementation of liberal discovery in civil matters.

[12] In another North Carolina retrial situation considered in *State* v. *Overman,* 269 N. C. 453, 153 S. E. 2d 44 (1967), an accused rapist's pretrial request for details concerning the evidence to be presented against him was denied on the ground that he could simply study a transcript of his prior acquittal of a kidnaping charge arising out of the same transaction.

[13] The most comprehensive and recent statement of criminal discovery in North Carolina is A Look At North Carolina's Criminal Discovery System Prepared for North Carolina Governor's Committee on Law and Order, Task Force on Arrest and Apprehension, A. Pye, Chmn. (1970): "Very little use is being made of the new (1967) criminal discovery statute (G. S. 15–155) which is resulting in a paucity of cases dealing with the extent to which it allows discovery. It is unclear whether the attorneys are not aware of

240

Thus, it is not surprising that Britt's investigative and preparatory resources were puny in contrast to those employed by his accusers. The local police were able to enlist the talent of the State Bureau of Investigation to trace and analyze fingerprint evidence. Investigators were able to study the situs of the murder. At their convenience officers were able to interrogate the incarcerated defendant, eventually eliciting from him an incriminating statement. After the mistrial the prosecutor, unlike Britt's lawyer, had access to a transcript to readjust his trial strategy.

This Court has been sensitive to the persuasive arguments for more liberal rules of criminal discovery.[14] To

---

the statute or whether they feel that there is little use in filing a motion under it. . . . Indications are that both these reasons have vitality," *id.*, at 14–15. It continues:

"There is a strong possibility that solicitors (consciously or unconsciously) withhold evidence favorable to the defendant. . . ." *Id.*, at 16.

In addition to the discussion of such procedures in *State* v. *Goldberg,* 261 N. C. 181, 134 S. E. 2d 334 (1964), see *State* v. *Hamilton,* 264 N. C. 277, 141 S. E. 2d 506 (1965) (access to police reports and notes denied); *State* v. *Overman, supra,* at 468, 153 S. E. 2d, at 57; see also *Goldman* v. *United States,* 316 U. S. 129 (1942), cited with approval in *Goldberg, supra,* at 191, 134 S. E. 2d, at 341, holding that a defendant has no right to inspect memoranda used by prosecution witnesses to refresh their memories. See generally the restatement of the common-law rules of discovery, cited by the *Goldberg* court, *supra,* at 191, 134 S. E. 2d, at 340, in 23 C. J. S., Criminal Law §§ 955 (1) and (2).

[14] See *Pyle* v. *Kansas,* 317 U. S. 213 (1942); *Jencks* v. *United States,* 353 U. S. 657, 668 (1957); *Brady* v. *Maryland,* 373 U. S. 83 (1963). In *Dennis* v. *United States,* 384 U. S. 855, 873 (1966), we required a trial court to allow inspection by a defendant of grand jury minutes, reasoning that: "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact."

the extent that a State permits criminal discovery by its accused, it is our duty to forbid distribution of its fruits according to formulas based on wealth, which, like race, is a suspect classification. *Griffin* v. *Illinois, supra; Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969).

The provision in North Carolina permitting defendants to purchase mistrial minutes is obviously an important exception to the common-law prohibition. A mistrial transcript contains not only prosecution witnesses' names and addresses but their stories under oath and it contains the entire theory of the government's case. Such a document is a complete dossier of the opposing case for which even the most liberalized rules of civil discovery have no equivalent. While this exception endures, the State may not condition its availability upon financial considerations which effectively deprive the poor of this valuable tool.

### III

The lower court's opinion suggests that whatever legitimate uses generally might be made of mistrial minutes could alternatively be accomplished by counsel's calling as a witness the court reporter of the previous prosecution. See also *Nickens* v. *United States,* 116 U. S. App. D. C., at 341, 323 F. 2d, at 811. However satisfactorily that suggestion might facilitate impeachment of government witnesses, it should be clear that the procedure would provide no assistance in preparing counsel for trial.

Moreover, the procedure of calling a court reporter to verify hostile witnesses' contradictions has been discredited by trial commentators, including Professor Robert Keeton:

"If you have caught the witness in a contradiction,

it is the more clearly shown if the exact words previously used by the witness are brought to the jury's attention. The effect may extend beyond the bearing of the contradiction on its own subject matter, for the witness may be 'broken down' so that he makes other admissions or the jury disbelieves other parts of his testimony. *Calling upon the reporter to read such prior testimony during the examination, however, is rarely a practicable method of confronting the witness with such contradiction.* Many trial judges will decline to permit the practice because of the great delay usually involved, while the reporter is seaching through his notes in an effort to find the part of the testimony to which you refer. Even if the judge will permit the practice, the wisdom of its use is questionable. The jury and court may grow impatient, and the witness will have been afforded a considerable period of time to think about the matter and be prepared with an explanation or excuse." R. Keeton, Trial Tactics and Methods 103 (1954). (Emphasis added.)

Indeed these hazards were painfully present in *United States ex rel. Wilson* v. *McMann, supra,* in which Wilson's attorney erroneously believed he remembered an inconsistent statement of a prosecution witness who had testified at the prior mistrial. At the second trial the lawyer quizzed the witness concerning this prior remark but the witness denied having ever made it. The judge decided to delay the trial until the reporter of the mistrial could read back the precise words used by the witness. After "considerable delay and perhaps some inconvenience to the jurors" counsel learned that he had been mistaken and that no contradiction, at least on the suspected issue, had existed. *Id.,* at 898.

I am not satisfied that the procedure afforded paupers by the *Nickens* majority is a reasonable substitute for full access to a mistrial transcript. Accordingly, I would hold under the *Griffin-Roberts-Wilson* line of authority that Britt has been denied equal protection of the laws.[15]

I would reverse the judgment below.

---

[15] The majority does not disagree that under ordinary circumstances Britt would have been denied equal protection of the laws. The majority, however, distinguishes Britt's case from the routine case because he was tried in a small town where defense counsel was well acquainted with the court reporter. Counsel, reasons the Court, ought to have prevailed upon the reporter between trials to assist in his making notes of the first trial. I believe that these kinds of fortuities ought not to be determinative of constitutional guarantees, especially where it may be difficult afterwards to establish the nature of such alleged relationships.