STATE of Missouri, Plaintiff-Respondent,

v.

Gary HOLLAND, Defendant-Appellant.

No. 36221.

Missouri Court of Appeals,
St. Louis District,
Division Three.

July 1, 1975.

Motion for Rehearing or Transfer
Denied Aug. 7, 1975.

Application to Transfer Denied
Sept. 8, 1975.

Charles D. Kitchin, Public Defender, John F. Bauer and James C. Jones, Asst. Public Defenders, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean and Philip M. Koppe, Asst. Attys. Gen., Jefferson City, Brendan Ryan, Circuit Atty., Julius D. Cosentino, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

SIMEONE, Presiding Judge.

Defendant-appellant, Gary Holland, was charged, tried and found guilty by a jury of forcible rape, and his punishment was fixed at four years. § 559.260 RSMo 1969, V.A. M.S. In accordance with the jury verdict, the court, after overruling a motion for new trial and granting allocution, sentenced him to the department of corrections. He appeals. For reasons hereinafter stated, we affirm the judgment. This was the second trial of the cause. In the first trial held in November, 1973, the jury was unable to reach a verdict.

Since the appellant does not question the sufficiency of the evidence, only those facts which are necessary for the disposition of the points raised on appeal will be recited. A jury could reasonably find the following.

In the early morning hours of April 2, 1973, Mr. John Leach, Jr., a cook employed by the Sheraton-Jefferson Hotel located at 12th and Locust Streets in the City of St. Louis, worked late and stayed in room 374 of the hotel. At about 4:30 a. m. he rose to go to work. He left the key to the room on the hotel desk. The hotel has a large lobby, steps in the lobby leading to the mezzanine, and steps to the second and third floors. There were hallways and offices located on these floors and rooms on the third floor.

At about 1:30 on that afternoon, two young women, Kathryn King and Sandy Hutchinson, who worked at one of the local newspaper offices located on 12th Street, had finished lunch and were walking on the east side of the street, and north on 12th near the hotel. As they were walking, they saw a white girl and black young male walking south. They were "coming toward us." The couple did not pass, because at the corner they crossed the street. The girl was "really held kind of closely, tight like," around the waist. Quite a few people turned around to look. Kathy saw the couple at the door of the hotel, going into the hotel. Sandy made a comment about the man's hairline—"for an Afro how high it was on the neck . . . ." Sandy saw the couple, and noticed that the man was holding her "[e]xtremely close." She said something to the effect that it "looks like he had a gun on her or something. He was just so close to her that it is one thing to be in love, but he was just smothering her more or less." The two girls didn't do anything because "they could have had a lovers' quarrel." Sandy said that the man was tall, small built and young, had keen features and was medium brown. Later Sandy viewed some photographs and picked out the appellant.

The young woman the two girls saw was S― M―. S―, age nineteen and an employee of the same newspaper but not acquainted with Kathy and Sandy, had finished lunch and was returning to work at the paper. At about 1:20, when she was approaching Locust and 12th, she noticed "somebody walking real close behind me." She did not look behind her. Between St. Charles and Washington, "[s]omebody came

up behind me and grabbed me and told me not to scream, or be scared or they would kill me." S— asked what he wanted, and he said "my money." S— tried to give it to him, but he said "he didn't want it here, not to say anything, or he would kill me." At the time the man was holding her around the waist, holding her arm down, and with his other hand had something in her side. The man took her into the hotel. They went through the door, up the stairs, up some more stairs, entered a hallway, went to the third floor, "walked down the hall to a room and he got the key out and opened the door." The man continued holding her.

On the second floor, Brenda Stabinsky, an employee of an advertising company with offices there, saw a Negro male and white woman come up from the mezzanine. No people, "other than are working on the executive floor are supposed to be on that floor . . . ." She saw the couple proceed to the third floor. The man was leading her; "he was holding her very, very tight . . . ." Sometime after the incident Brenda, having been shown some photographs, picked out the defendant.

The couple went into room 374. S— gave him money and told him to "leave me go." The man grabbed her purse, pushed her by the window and told her to take her clothes off. "If I wouldn't he would take them off for me." "Then he came over to me and I still wouldn't take them off, and he took what I learned was a nail file, and kept jabbing it in my throat, and told me to take my clothes off or he would kill me, he wasn't kidding." She did undress; he threw her on the bed and raped her. "I told him to get off me, he was hurting me . . . ." In answer to a question by the prosecutor—"Why did you tell him he was hurting you?"—she replied, "Because I had never had intercourse before." This statement was objected to; the court sustained the objection and instructed the jury to disregard it, but denied a request for mistrial.

After the rape, the man took S—'s clothes and used them to tie her up and gag her. He took her watch and ring and left. She untied herself and called the security office on the phone. In the room during the episode, S— "really" saw the man. At trial, S— had no "question in [her] mind" that it was the defendant who raped her.

On cross-examination of S—, counsel for the defendant brought out certain discrepancies concerning the hotel and the room. In the first trial, for example, she testified that the man opened the doors to the hotel, although they are automatic; she testified before that there were two windows and in the second trial said there was one; in the first trial she said there were blinds on the window and now indicated there were drapes. On cross-examination she also stated that she viewed his body and the arms, and didn't remember seeing or didn't know there was a "tattoo" on his arm.

When S— made the phone call, the executive housekeeper, Jean Standley, and a security officer were having lunch in the hotel. The security officer received a call that a young lady was in trouble and "claims to have been raped." The officer and Mrs. Standley went to room 374. They knocked, and S— told them she had been raped. She was very, very frightened. Mrs. Standley indicated that it would be a very rare occasion to permit a 15-year-old to rent a room.

The police were summoned, and S— told her story to Police Officer Clobes, describing the assailant as medium to "light complexioned," in his late teens.

On April 11, 1973, several police officers went to the home of Gary Holland on Delmar, and he was arrested by Officer Robert Nichols. At the time of the arrest, and at the time of the lineup, Officer Nichols and other officers did not notice any initials on the defendant's arm. The ring and watch were not recovered.

The defendant, a juvenile, was immediately taken to the juvenile court in accordance with law, and a lineup was held with

several other young men. S—— recognized the defendant as the man who raped her, and "picked him out of the lineup." The persons in the lineup were dressed alike, "and all about the same height and age."

A juvenile officer testified for the state. Either one or two days after the defendant was brought to the juvenile court, the juvenile officer noticed that "there were initials that appeared to be written in ink on his arm." And at a later time, prior to his hearing in the juvenile court, there appeared to be "some fresh scratching in the area where the initials—." He remembered two initials, but at trial there were four.

At trial, Dr. James Hurd testified that he examined S—— on April 2. There were some abnormal findings. "They consisted of a scraped area of the skin near the opening of the internal female sexual organ, and also there is a defect in the hymen." There were also sperm cells.

As stated, the defendant was first tried in November, 1973, which resulted in a mistrial. On February 6, 1974, prior to the beginning of the second trial on March 25, the trial court held a hearing on the defendant's motion to produce a transcript of the first trial. At the hearing, defense counsel admitted that he tried the previous case and heard the testimony of all the witnesses. The trial judge who heard the first case offered his extensive notes, and stated if the witnesses "undertake to testify differently and you need to impeach them, then the court reporter will be made available to you for that purpose . . . ." The court noted that the defense had taken the deposition of S—— and concluded, "They couldn't have the transcript prepared even if they had money to pay for it within time—retrial of this case. No way they could do it. . . . . [I]f [the witnesses] make any substantial variance in their testimony that would prejudice your client . . . then the court reporter will be available for you . . . ." The court thereupon denied the motion to produce the transcript.

At trial, the defense called the court reporter at the first trial who read certain testimony of S—— showing the discrepancies as to the physical aspects of the hotel and hotel room, and as to the fact that she got a "good look at his arms." The defense also called an attorney with the public defender's office assigned to the juvenile court. He spoke to the defendant on April 12th and "noticed a tattoo located on his left arm," but did not see any "scabs on his arm."

In rebuttal, the juvenile officer was recalled who stated that there was "dry blood, or scratch marks" on the arm. In rebuttal, one of the officers who assisted in the arrest on April 11, testified that he did not notice any writing on defendant's arms. Also in rebuttal, the state called, over the objection of the defendant, Judith Buckman and Lise LaForce who witnessed the lineup on April 11th. Each of them testified that she did not notice any "writing" on his arms.

Instructions were given, and the jury found the defendant guilty and assessed his punishment at four years.

On this appeal, appellant raises four points. He contends that the trial court erred (1) "in permitting the state to offer testimony concerning a lineup conducted while the defendant was still in the custody of the juvenile court"; (2) in denying the motion to produce the transcript of the defendant's first trial for the "reason that defendant was thus deprived of his right to adequate and effective confrontation and cross-examination of the state's witnesses, equal protection of the laws and, effective assistance of counsel during his second trial"; (3) in refusing to grant a mistrial after the prosecutrix testified as to her "virginity" at the time of the act, and "to refuse to sustain an objection to the testimony of the examining physician as to the same subject because such testimony was immaterial and unnecessarily inflammatory"; and (4) in overruling defendant's objections to the rebuttal testimony of Judith Buckman and

Lise LaForce because such testimony was "irrelevant and prejudicial."

We find none of the appellant's points to be meritorious and conclude that the judgment of conviction should be affirmed.

As to the first point, appellant argues that § 211.271(3), RSMo 1969, V.A.M.S.,[1] prohibits the state from offering testimony in a criminal proceeding concerning a lineup conducted while the defendant was in the custody of the juvenile court. In particular, appellant contends that the failure of the trial court to suppress the lineup identification testimony of S__ was error in light of the statute. Relying on *Harling v. United States*, 111 U.S.App.D.C. 174, 295 F.2d 161, 164 (1961),[2] appellant urges that unless juvenile and criminal proceedings are "clearly separated," juvenile proceedings will "serve as an adjunct to and part of the adult criminal process," thus destroying the juvenile court's parens patriae relation to the child and "would violate the non-criminal philosophy," which underlies the juvenile court act.

■ However, our Supreme Court has ruled that § 211.271 does not insulate a juvenile from appearing in a lineup, nor does it prohibit someone from testifying as to what he saw when he viewed a juvenile in a fair lineup. *State v. Richardson*, 495 S.W.2d 435 (Mo.banc 1973).

"We find no language in § 211.271 which expressly or by implication indicates that the General Assembly intended by that statute to prohibit someone testifying as to what they saw when they looked at a juvenile in a fair lineup. . . . To hold that § 211.271 insulates a juvenile from a lineup so long as he has

not been discharged from custody of the juvenile court is to unnecessarily handicap proper police and juvenile officer investigation. Such a lineup does not equate with taking statements or confessions from the juvenile. No confidence is breached. The parens patriae philosophy is not violated. . . ." 495 S.W.2d at 439.

Our Supreme Court reaffirmed its position later in *State v. Thompson*, 502 S.W.2d 359 (Mo.1973). In *Thompson*, appellant charged that the trial court erred in failing to suppress a lineup at the juvenile court because its results were admitted in a prosecution under the general law in violation of § 211.271. Rejecting this contention and citing *Richardson*, the court stated, "This, too, is no longer an open question in Missouri." 502 S.W.2d at 363.

We therefore hold that the trial court did not err in failing to suppress the state's evidence concerning the lineup conducted while appellant was still in the custody of the juvenile court.

Next, appellant contends that the court erred in denying his motion to produce the transcript of his first trial. He relies primarily on *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971).

In *Britt, supra*, petitioner was tried for murder. The first trial ended in a "hopeless deadlock." A retrial was then scheduled for the following month. In the interim, petitioner filed a motion alleging he was indigent and requested a free transcript of the first trial. The North Carolina appeals court affirmed the denial of the motion, stating that the record did not reveal a sufficient need for the transcript. The Supreme Court of the United States granted

1. § 211.271(3), RSMo 1969, provides:

"After a child is taken into custody as provided in section 211.131, all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any

purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."

2. Cf. *In Interest of A.D.R.*, 515 S.W.2d 438 (Mo.banc 1974); *State v. Wright*, 515 S.W.2d 421 (Mo.banc 1974); *State v. McMillian*, 514 S.W.2d 528 (Mo.banc 1974); and *State v. Ross*, 516 S.W.2d 311 (Mo.App. 1974).

certiorari. The court held that, while the principle of *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1955), is applicable, no violation of that rule has been shown "in the narrow circumstances of this case." The court stated that "*Griffin v. Illinois* and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is *needed* for an effective defense or appeal. . . ." (Emphasis added.) 404 U.S. at 227, 92 S.Ct. at 433.

There are two relevant factors, the court stated, to determine need: (1) the value of the transcript to the defendant and (2) the availability of alternative devices that would fulfill the same function as a transcript. As to value, the court agreed that there would be serious doubts of the North Carolina decision if it rested on the failure to specify "how the transcript might have been useful to him." The cases recognize value to a defendant "without requiring a showing of need tailored to the facts of the particular case." Value exists either as a discovery device in preparation for trial or for the impeachment of witnesses. The Supreme Court affirmed the denial of the transcript, because the North Carolina court rested its decision on the "availability of adequate alternatives to a transcript." The second trial was before the same judge, with same counsel and the same court reporter, and the two trials were only a month apart. The trial court suggested that the memory of petitioner and his counsel should have furnished an adequate substitute for the transcript, and in addition the petitioner could have called the court reporter to read to the jury the testimony of the previous trial. While the court rejected the suggestion that counsel must keep exhaustive notes of the testimony at

trial or have a perfect memory, during the oral argument on appeal, it "emerged" that the petitioner could have had the reporter read back to counsel his notes of the mistrial in advance of the second trial if "counsel had simply made an informal request."

Appellant attempts to distinguish the case at bar from *Britt v. North Carolina, supra,* in several particulars to support his contention that he did not have adequate alternatives and therefore it was error to deny his motion for a free transcript. Defendant admits he had the same counsel who could have taken notes but that this is not a sufficient alternative. He cites *Britt* as stating that "[w]e have repeatedly rejected the suggestion that in order to render effective assistance, counsel must have a perfect memory or keep exhaustive notes of the testimony given at trial. . . ." 404 U.S. at 229, 92 S.Ct. at 434.

■ Under the circumstances of this case we hold that the trial court did not err in denying the motion for a transcript. There was no equal protection issue here. The trial court noted, "They couldn't have the transcript prepared even if they had money to pay for it within time—retrial of this case." And there were sufficient alternatives present. The trial court offered its notes; the trial court stated that if the witnesses testified differently the court reporter would be made available; the defense took S____'s deposition; the court reporter in the first trial was in fact made available to the defense—she testified for the defense—and counsel for the defendant brought out several inconsistencies of fact. We believe therefore that there were alternative available devices that fulfilled the function of a complete transcript. Hence, we hold that there was no error in denying the motion. See *State v. Ambus,* 522 S.W. 2d 306, 310 (Mo.App.1975).

Appellant relies on *United States ex rel. Wilson v. McMann,* 408 F.2d 896 (2nd Cir. 1969), and *United States v. Young,* 472 F.2d 628 (6th Cir. 1972). In *McMann,* the court noted the whole case turned on the credibil-

ity of an undercover agent, and the court concluded that the transcript was an instrument needed to vindicate the defendant. Here, the transcript was requested for the purpose of attempting to impeach S___'s testimony concerning certain physical aspects of the room. In *Young*, the court noted that:

> "The record does not reflect that the trial court made any reference to the availability of the court reporter to read back the testimony on the first trial until . . . almost three months after the conclusion of the second trial. . . ." *United States v. Young*, supra, 472 F.2d at 629.

Here the court reporter was available before and at the trial on March 25.

Appellant's third point contains two separate allegations of error: (1) that the court erred in refusing to grant a mistrial after "the prosecutrix testified to her virginity"[3] at the time of the act, and (2) that the court erred in refusing to sustain an objection to the testimony of Dr. Hurd "as to the same subject."[4]

As to the first, the court did not err in refusing to grant a mistrial. S___'s statement was objected to and the jury was instructed to disregard it. The declaration of a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where the prejudicial effect can be removed in no other way. *State v. Heather*, 498 S.W.2d 300, 303 (Mo.App. 1973); *State v. Raspberry*, 452 S.W.2d 169, 173 (Mo.1970). This is a matter which rests within the sound discretion of the trial court which is in the best position to judge the effect and the possibility of removal of any prejudice short of a mistrial. *State v. Camper*, 391 S.W.2d 926, 928 (Mo.1965). Where, as here, the jury was instructed to disregard the statement, ". . . the reviewing court, in order to hold that the failure to grant a mistrial was reversible

error, must determine and conclude as a matter of law from the entire record that the error was prejudicial and so impressive that its effect was not removed by the action of the trial court. . . ." *State v. Dennison*, 428 S.W.2d 573, 577 (Mo.1968). We cannot conclude that the trial court abused its discretion in overruling the motion for mistrial.

As to Dr. Hurd's statement, there was no error in its admission. The defendant was charged with forcible rape in violation of § 559.260, RSMo 1969, V.A.M.S. The state was required to prove beyond a reasonable doubt all of the essential elements of the offense. *State v. Bryant*, 507 S.W.2d 672, 674 (Mo.App.1974). Dr. Hurd's testimony was relevant to the issues of carnal knowledge and force.

Appellant argues that inasmuch as the fact of rape was not challenged and the question was one of mistaken identification, the evidence of S___ and Dr. Hurd was immaterial and unnecessarily inflammatory. To the contrary, the statements were material and relevant.

"To establish the crime of rape, the essential elements of carnal knowledge by force against the will of the woman must be shown," *State v. Garrett*, 494 S.W.2d 336, 338 (Mo.1973), and the state cannot be unduly limited in its quantum of proof. *State v. O'Toole*, 520 S.W.2d 177, 181 (Mo.App. 1975).

In *People v. Stephens* 310 N.E.2d 824, 830–831 (Ill.App.1974), it was stated:

> ". . . Inasmuch as want of consent is a substantive issue in the State's case, the prior chastity of the complaining witness is both material . . . and relevant. . . .
>
> Nor are we of the opinion . . . that evidence of prior chastity, elicited during the State's case in chief, becomes

---

**3.** S___ did not use the word "virginity." In answer to a question, "Why did you tell him he was hurting you?", she replied, "Because I had never had intercourse before."

**4.** Dr. Hurd testified that he found a "defect in the hymen."

immaterial when the defense is not consent but mistaken identification. It is true that prior chastity becomes immaterial when defendant, in its case, interposes the defense of mistaken identity; however, the State is not obligated to anticipate the avenue of defense and limit its proofs accordingly . . . ."

We find no error in admitting the testimony of S___ or Dr. Hurd.

Lastly, appellant contends that the court erred in overruling the objections to the rebuttal testimony of Judith Buckman and Lise LaForce because such evidence was irrelevant and prejudicial.

■ The scope of rebuttal testimony is largely within the sound discretion of the trial court and unless the court abuses this discretion, or the defendant's rights are prejudicially affected, the appellate court will not reverse. *State v. Williams*, 442 S.W.2d 61, 65 (Mo.banc 1968), overruled on other grounds, *State v. Ayers*, 470 S.W.2d 534, 538 (Mo.banc 1971).

■ The real issue in this case centered around the identification of the defendant as the assailant. A factual issue developed as to whether the rapist had a "tattoo" or some kind of writing on his left arm. S___ testified that she had a good view of the offender's torso and his arms at the time of the incident on April 2, 1973, and that she did not remember seeing a "tattoo" on his left arm. The juvenile officer stated that he noticed a "tattoo" when he spoke with the defendant "one or two days" after April 11, 1973, the day the lineup was conducted. The attorney with the office of the public defender who represented indigents at the juvenile court, testifying on behalf of the defendant, stated that he interviewed defendant on April 12, 1973, and he observed the "tattoo" marks.

In rebuttal, the state presented Judith Marie Buckman and Lise LaForce, who testified over defendant's objection that they observed defendant at a lineup at the juvenile court on April 11, 1973, and that they

did not notice any writing on his arms. Appellant argues that this testimony was irrelevant, since it was not disputed that the appellant had "tattoos" [writing] on his arm when he was taken into custody. We disagree. The issue of the tattoo and when it was placed on appellant's arm is a material issue affecting the accuracy of S___'s identification of the appellant as the assailant. S___ did not remember seeing a tattoo on his left arm on April 2, 1973. At trial, however, appellant indeed had tattoo marks on his left arm. The attorney's testimony that he noticed a "tattoo" on appellant's arm on April 12, 1973, only ten days after the rape, suggests that the tattoo was also present on April 2, 1973, the date of the rape. Therefore, the testimony of Judith Marie Buckman and Lise LaForce that they did not notice any marks on defendant's arm when they observed the defendant in the lineup on April 11, 1973, was competent evidence tending to counteract and disprove the evidence offered by the defendant. *State v. Peterson*, 518 S.W.2d 1, 3 (Mo. 1974).

■ Appellant further contends that the rebuttal testimony of Miss Buckman and Miss LaForce was unnecessarily prejudicial in that they were "alleged victims of other offenses allegedly committed by the defendant." This contention is equally without merit. There is nothing in the record to indicate that the jury knew that they were alleged victims, nor do we believe, as defendant suggests, that the jury must necessarily infer that they were victims from the mere fact that they viewed defendant in a lineup. The reason for their presence at the lineup was not explored. We therefore find no error in the trial court's refusal to sustain defendant's objection to the rebuttal testimony.

We have read the complete transcript, the briefs of the parties, all of the authorities relied upon by the appellant, and we are convinced that no prejudicial error occurred, and that the judgment should be affirmed.

The judgment is affirmed.

**266**

GUNN, J., concurs.

McMILLIAN, J., dissents in separate opinion.

McMILLIAN, Judge (dissenting).

I respectfully dissent from that portion of my colleague's opinion which upholds the right of the trial judge to deny a defendant a copy of the original transcript of the first proceedings. While it is true that there is here no equal protection issue, yet there is here an issue of fundamental fairness. The majority opinion bases its holding upon the questionable basis that the trial judge's notes and the availability of his court reporter serves the same principle as the original trial transcript. Alternatives, as is often the case, are deceptive. Every experienced trial judge and lawyer knows the impact of verified, sworn, written transcripts upon both juries and witnesses alike. And to say that unsworn, hurriedly scribbled judge's notes and the use of a court reporters' nondescript, unorganized testimony during a trial fulfills the same function of a complete transcript, to say the least, is naive.

The silent issue that was not addressed by the majority opinion is dramatized by the unsworn, unproven, self-fulfilling prophecy of the trial judge, "[T]hey couldn't have the transcript prepared even if they had money to pay for it within time—retrial of this case." Stated another way, the court was more interested in case movement than it was in the quality of the trial. Hopefully, the time will never come when we, as jurists, because of the pressure from overloaded trial calendars and dockets will sacrifice, for speed, the quality of justice that we attempt to dispense.

I would reverse and remand for a new trial.