# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

THOMAS JOSEPH AGAR,

Defendant-Appellant.

UNPUBLISHED
February 2, 2016

No. 321243
St. Clair Circuit Court
LC No. 13-001935-FH

Before: RONAYNE KRAUSE, P.J., and GLEICHER and STEPHENS, JJ.

GLEICHER, J. (*concurring*).

"[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v Oklahoma*, 470 US 68, 77; 105 S Ct 1087; 84 L Ed 2d 53 (1985). The "raw material" integral to Thomas Agar's defense amounted to $1,500, the sum needed to hire an expert in computer forensics. The prosecution's case rested entirely on the testimony of a well-trained, experienced computer forensics investigator. Agar was relegated to constructing a rebuttal to the prosecution's expert through cross-examination uninformed by consultation with a similarly-skilled computer specialist. The result was a fundamentally unfair trial. I fully concur with my colleagues' decision to reverse defendant's computer-related convictions, and write separately to expand on the majority's due process analysis.

The prosecutor charged defendant with three crimes arising from defendant's alleged use of a computer to traffic in child sexually abusive material: distributing child sexually abusive material, MCL 750.145c(3), possessing child sexually abusive material, MCL 750.145c(4), and using a computer to commit a crime, MCL 752.796. Each offense requires the prosecution to prove beyond a reasonable doubt that defendant *knowingly* engaged in prohibited conduct. To convict a defendant of distributing child sexually abusive material the prosecution must prove that the defendant "distributed . . . the material with criminal intent." *People v Tombs*, 472 Mich 446, 465; 697 NW2d 494 (2005). "[T]he mere obtaining and possessing of child sexually abusive material using the internet does not constitute a violation of MCL 750.145c(3)." *Id*. Similarly, MCL 750.145c(4) requires that the prosecution prove that a defendant "knowingly possesses" child sexually abusive material. Our Supreme Court has explained that "unless one knowingly has actual physical control or knowingly has the power and intention at a given time to exercise dominion or control over a depiction of child sexually abusive material . . . one cannot be classified as a 'possessor' of such material." *People v Flick*, 487 Mich 1, 13-14; 790

NW2d 295 (2010). MCL 752.796 penalizes "the use of a computer to commit a crime," *People v Loper*, 299 Mich App 451, 466; 830 NW2d 836 (2013), which inherently involves intentional conduct.

Agar's sole defense was that he never intentionally or knowingly downloaded child sexually abusive materials. Agar explained that he often downloaded mainstream adult and animated movies into his home computer system, which he had personally assembled from a "bare bones" kit. He had also repaired computers for students attending the Lawrence Tech Osborn Center, which sometimes involved copying a student's hard drive into his own computer's hard drive. During one such effort, Agar discovered that he had inadvertently copied a peer-to-peer file-sharing program called "Shareaza," which then took up residence in his hard drive. The Shareaza software harbored and disseminated the child sexually abusive material discovered by St. Clair County Sheriff's Detective Eric Stevens. Agar's defense hinged on proof that the child sexually abusive material found by Stevens could have made its way to Agar's computer inadvertently, through Shareaza.

Peer-to-peer networks such as Shareaza are "so called because users' computers communicate directly with each other, not through central servers." *Metro-Goldwyn-Mayer Studios, Inc v Grokster, Ltd*, 545 US 913, 919-920; 125 S Ct 2764; 162 L Ed 2d 781 (2005). The software allows users to search for files located in shared folders created by and stored in software used by other computers. A requesting user can download a sought file directly from the computer being "shared" through the software. *Id.* at 921. "The copied file is placed in a designated sharing folder on the requesting user's computer, where it is available for other users to download in turn, along with any other file in that folder." *Id.* Caselaw seems to indicate that Shareaza's default settings can provide for automatic, reciprocal sharing "and required additional steps if a user did *not* want to share files with others using the program." *United States v Spriggs*, 666 F3d 1284, 1286-1287 (CA 11, 2012) (emphasis added).

Agar and his counsel sought to investigate Shareaza's technical capabilities and its operation within Agar's computer by retaining Larry Dalman, a retired Michigan State Police officer and forensic computer expert. The trial court denied this request, declaring that although it seemed "possible" that defendant's version of events could be true, funding for an expert was unnecessary because "that's a fairly simple concept unless there's a whole lot more to it than I know[.]" The trial court encouraged defense counsel to "do[] your own investigation and research into that to find out what you can and cannot learn on that subject to prepare yourself for cross-examination."

Detective Stevens testified as an expert in computer forensics in support of the prosecutor's position that regardless of how Shareaza wound up on defendant's computer, defendant deliberately used Shareaza to share illegal videos. As was evident from Stevens' testimony and defense counsel's cross-examination, the trial court vastly overestimated the "simplicity" of the subject matter or the ease with which helpful admissions could be elicited.

Further, cross-examination, no matter how skilled or effective, is not a substitute for the testimony of an opposing expert witness.[1]

The Due Process Clause guarantees that an indigent defendant facing the judicial power of the State must be afforded "a fair opportunity to present his defense." *Ake*, 470 US at 76. While this principle does not require a state to "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," it does obligate the state to provide the " 'basic tools of an adequate defense[.]' " *Id*. at 77, quoting *Britt v North Carolina*, 404 US 226, 227; 92 S Ct 431; 30 L Ed 2d 400 (1971). In *Ake*, the "basic tool" was the assistance of a consulting psychiatrist. The United States Supreme Court framed the issued presented in that case as "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense." *Ake*, 470 US at 77.[2] The Court analyzed this question by weighing the three guideposts for determining the process due in a particular case as set forth in *Mathews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

As the Supreme Court observed in *Ake*, "[t]he interest of the individual in the outcome of the State's effort to overcome the presumption of innocence is obvious and weighs heavily[.]" *Ake*, 470 US at 78. The State's interest is solely economic: husbanding the public fisc. This is so because "the State's interest in prevailing at trial – unlike that of a private litigant – is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases." *Id*. at 78-79. "[A] State may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict

---

[1] Defense counsel's cross-examination proves this point. Although counsel took to heart the trial court's instruction to perform research and "find out what you can" about the subject matter, counsel was stuck with Stevens' answers. For example, counsel inquired whether Shareaza's default setting included sharing. Stevens indicated that the user had "to check a box. You have to indicate: Yes, I do want to share." This answer appears contrary to the evidence discussed in *Spriggs*. In any case, it is a question that Agar was entitled to ask his own expert, and a subject potentially ripe for disagreement by an opposing expert.

[2] A number of courts have applied *Ake*'s reasoning to a defendant's requests for expert assistance in areas other than psychiatry. For a list and summary of the cases, see Giannelli, *Ake v. Oklahoma: The Right to Expert Assistance in a Post-Daubert, Post-DNA World*, 89 Cornell L Rev 1305, 1367-1368 (2004), and *Moore v State*, 390 Md 343, 409 n 12; 889 A2d 325 (2005) ("The majority of courts have concluded that *Ake* extends beyond psychiatric experts.").

obtained." *Id*. at 79.  The Supreme Court determined in *Ake* that the first two *Eldridge* criteria weighed heavily in the defendant's favor: "We therefore conclude that the governmental interest in denying Ake the assistance of a psychiatrist is not substantial, in light of the compelling interest of both the State and the individual in accurate dispositions." *Id*.

Agar's interest in leveling the expert-witness playing field is compelling.  And even assuming that the prosecution's interest in shielding the county from economic intemperance had any legal legitimacy, the monetary stakes here were minimal: $1,500.  Investment of this rather insubstantial sum in Agar's defense would have affording him "meaningful access to justice," *id*. at 77, and likely spared the County the far greater costs involved in a new trial of this case.

The last *Eldridge* component examines the "probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id*.   In *Ake*, the Supreme Court's evaluation of this factor centered on the critical role played by a psychiatric expert in a trial involving a defendant's mental condition.  The Court elucidated:

> [T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense.  In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question.  They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers.  Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand.  Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense. [*Id*. at 80-81(citation omitted).]

The prosecution insists that no such risks exist in this case because Detective Stevens thoroughly discredited the defense theories raised by Agar's counsel during cross-examination. This argument proves too much.  Were it accepted, no appellate claim challenging a denial of funding for expert assistance could ever succeed; the jury's guilty verdict would suffice to eliminate any possible merit to an unheard defense expert's opinions.[3]  As in *Ake*, Agar needed

---

[3] The prosecution's argument is essentially one of harmless error.  At least one court has found the denial of funding for a necessary expert structural error not subject to review for

an expert's technical assistance to educate counsel regarding which questions to ask and which theories to pursue. Agar's guilt depended on proof beyond a reasonable doubt that he personally had downloaded the child sexually abusive images. An independent examination of Agar's computer would have guided Agar's counsel and potentially discredited Stevens. Absent record evidence of Dalman's findings, it is simply impossible to determine whether Stevens' characterization of the evidence is irrefutable.[4]

Our Supreme Court recently emphasized that counsel's failure to secure expert assistance in preparing and presenting a defense constitutes ineffective assistance of counsel when expert testimony is central to the prosecution's proofs and the underlying technical issues are "highly contested." *People v Ackley*, 497 Mich 381, 393-394; 870 NW2d 858 (2015). Here, counsel did exactly what was needed to perform effectively: he sought expert help. By denying counsel an opportunity to obtain the assistance needed to effectively represent Agar, the trial court tied one hand behind counsel's back. The fight at the trial focused solely on whether Agar knowingly and deliberately downloaded the child sexually abusive material. The trial court's ruling ensured that Agar would lose that fight. My views echo those of the majority, and I join its opinion in full.

/s/ Elizabeth L. Gleicher

---

harmlessness. *Rey v State*, 897 SW2d 333, 345 (Texas Crim App, 1995). As the Court pointed out in *Rey* the Supreme Court in *Ake* reversed and remanded for a new trial without consideration of harmlessness.

[4] Recent exposés regarding the fallibility of prosecution scientists and laboratories should counsel pause when evaluating the validity of unchallenged testimony. See *Hinton v Alabama*, __ US __; 134 S Ct 1081, 1090; 188 L Ed 2d 1 (2014):

> That the State presented testimony from two experienced expert witnesses that tended to inculpate Hinton does not, taken alone, demonstrate that Hinton is guilty. Prosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials . . . . One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases." *Melendez-Diaz v Massachusetts*, 557 U S 305, 319; 129 S Ct 2527; 174 L Ed 2d 314 (2009) (citing Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va L Rev 1, 14 (2009)). This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses; it is maximized when the defense instead fails to understand the resources available to it by law.