**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ANTHONY HEINEMANN,

      Petitioner-Appellant,

v.

MICHAEL MURPHY, Warden,
Wyoming State Penitentiary; BRUCE A.
SALZBURG, Wyoming Attorney
General,

      Respondents-Appellees.

Case No. 08-8028

(D.C. No. 2:06-CV-00168-ABJ)
(D. Wyoming)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, MURPHY,** and **GORSUCH**, Circuit Judges.

Petitioner Anthony Heinemann, a Wyoming state prisoner who is presently serving a life sentence after conviction of sexual offenses involving minors, appeals from the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

## *Factual background*

The relevant underlying facts of this case were outlined in detail by the Wyoming

Supreme Court (WSC) in addressing Heinemann's direct appeal:

> On May 20, 1997, four junior high school students were walking home from school. They encountered Heinemann, who was in a maroon car, in the parking lot of a video store. The four minors, A.T., a thirteen year-old female; Z.K., a twelve year-old male; and T.H. and T.T., both fourteen year-old females, either requested or were offered a ride by Heinemann. After asking the students if they liked to party, and receiving an affirmative answer from A.T., who said she liked tequila, Heinemann stopped at a liquor store where he purchased some tequila, wine coolers and peppermint schnapps. They then picked up some lemons, and proceeded to Heinemann's apartment.

> At his apartment, they listened to music, and the students drank some of the alcoholic beverages. A.T. became intoxicated, and she went with Z.K. into the back bedroom. While they were out of the room, Heinemann asked T.H. and T.T. to play his version of strip poker in which the losers would remove clothing and possibly have sex. The two girls declined, even after Heinemann offered them twenty dollars to play. A.T., quite intoxicated, came out of the bedroom, and lost her balance while talking to a friend on the telephone. Heinemann held her up from behind, placed his hands under her shirt and brassiere, and rubbed her breasts until Z.K. told him to stop.

> The circumstances leading to the second charge occurred on October 16, 1997. On that occasion, Heinemann offered a ride to A.G., a female high school student aged eighteen. A.G. was across the street from her high school smoking a cigarette. Heinemann, driving a red tone car, offered to take A.G. to buy more cigarettes. Instead, he drove to his apartment, and invited A.G. to come in for a little bit. Once inside, Heinemann mixed two alcoholic drinks, and offered one to A.G. When she declined, Heinemann tried to force A.G. to take the drink, and spilled it on her.

> Heinemann then proposed a card game, and told A.G. that if she won, he would take her back to school, but if he won, she would remove an article of clothing. A.G. reluctantly agreed. They each picked a card, and

Heinemann told A.G. that he had won. He told her she had to take off a piece of clothing, and when she balked, he forcibly removed her t-shirt. Heinemann then proposed that they play another hand, promising to return her shirt and take her back to school if she won. Heinemann declared himself the winner of the second game, and demanded A.G.'s pants, which he forcibly removed when she resisted again. He then suggested a third round of the card game, still promising to return A.G.'s clothing and take her back to school if she won. Predictably, Heinemann won again, and he demanded A.G.'s brassiere, which he forcibly removed when she resisted.

Heinemann, after removing his own clothes, began kissing A.G.'s breasts, and told her he would use a condom. A.G. kicked Heinemann, dressed hastily, and attempted to leave the apartment. Heinemann grabbed her, and pulled her back, telling her she was not going anywhere. A.G. fell to the floor, hitting her head on a coffee table. She again attempted to leave, this time getting a few steps beyond the door, when Heinemann grabbed her hair, pulled her back into the apartment, and began choking her. He then apparently decided to end the assault, and offered to take A.G. back to school. Heinemann put his clothes back on, and at that point in time, a police officer, summoned by a neighbor, arrived.

Heinemann v. State, 12 P.3d 692, 694-95 (Wyo. 2000) (Heinemann I).

*State court criminal proceedings*

The WSC, in Heinemann I, also recounted the ensuing state court criminal proceedings that arose out of the above-outlined facts:

The events of May 20, 1997, involving the four minors, resulted in Heinemann being charged in the District Court for the First Judicial District, in and for Laramie County, in Docket 24, No. 474, with one count of taking indecent liberties with a minor and one count of furnishing alcohol to minors. He entered pleas of not guilty to both counts. In response to a motion from Heinemann, the trial court ordered the State to give notice if it intended to introduce evidence under W.R.E. 404(b)[1]. Heinemann also filed a motion in limine, seeking to prohibit the State from introducing evidence of prior sexual assault allegations or convictions.

---

[1] W.R.E. 404(b) refers to Wyoming Rule of Evidence 404(b), which is substantially similar to Federal Rule of Evidence 404(b).

3

Heinemann's assault on A.G. was addressed by charging him with one count of attempted first-degree sexual assault and one count of third-degree sexual assault in the District Court for the First Judicial District, in and for Laramie County, in Docket 24, No. 491. He entered pleas of not guilty to both counts. As in the other case, the trial court ordered the State to provide notice of its intent to introduce evidence under W.R.E. 404(b). Heinemann again filed a motion in limine to prevent the State from using evidence of prior sexual assaults.

In response to Heinemann's motion in Docket 24, No. 474, the State filed notice of its intent to introduce, as W.R.E. 404(b) evidence, five separate instances of Heinemann's prior bad acts:

1. Evidence that, in 1988 in Colorado, the Defendant engaged in similar conduct as that described by A.T. with [S.L.], a sixteen (16) year old. [S.L.] was approached by the Defendant in his vehicle, was given a ride, was given alcohol, and was forced to perform sexual acts before he would take her home.

2. Evidence that, in 1988 in Colorado, the Defendant engaged in similar conduct and use of force as that described by A.T. with [M.M], his roommate's girlfriend. She was home alone with the Defendant when he turned off the light, came up behind her, shoved her into the door, pressed his body into hers, and attempted to kiss her neck. She pushed him away and ran upstairs to her bedroom. The defendant pursued her into the bedroom, grabbed her by the arm and pulled her sweater off, grabbing her breast in the process. He then pushed her down onto the bed where she was able to kick him in the stomach. He left for [a] moment, but returned and started pushing her around again. She was able to dial 911, but the Defendant hung up the phone before she could speak. [M.M.] then ran downstairs to use the phone in the kitchen, but the Defendant tackled her as she reached the phone. Police arrived shortly thereafter. Police found an open prophylactic on the coffee table that the Defendant intended to use.

3. Evidence that, in May 1997, the Defendant engaged in similar conduct as that described by A.T. with [A.G.], an

4

eighteen (18) year old. [A.G.] was approached by the Defendant in his vehicle, was given a ride to his apartment, was offered alcohol, and forced to submit to sexual contact and attempted sexual intrusion.

4. Evidence that, in 1995 in Cheyenne, Wyoming, the Defendant engaged in similar conduct as that described by A.T. with [R.F.], a seventeen (17) year old neighbor. He approached her and offered her alcohol if she would come to his apartment. When she refused and began to walk away, the Defendant grabbed her by the arm and pulled her towards him. She pulled away and left.

5. Evidence that, in August in Cheyenne, Wyoming, the Defendant engaged in similar behavior as that described by A.T. with M.L., age fifteen (15). M.L. was walking her dog when the Defendant pulled up beside her in his vehicle and said hello. She said hi in return and kept on walking. The Defendant continued to drive along beside her waving a twenty (20) dollar bill at her. She then ran to a friend'[s] home. The Defendant continued to drive by the home of her friend until the friend's mother yelled at him to leave the young girls alone.

In response to Heinemann's motion in Docket 24, No. 491, the State gave notice of its intent to introduce the same evidence of Heinemann's prior sexual assaults, interchanging the assault on A.T. with the assault on A.G.

The State asserted that the acts were admissible under W.R.E. 404(b) to show plan, preparation, intent, course of conduct, and absence of mistake or accident. The trial court combined the hearing on Heinemann's motions in limine, but declined to rule at that time, saying that its ruling would depend on events at trial.

Heinemann's trial in Docket 24, No. 474 began on March 16, 1998. The trial court allowed the State to present evidence of four of the five prior bad acts enumerated by the State. No evidence of the assault on M.M. was offered, but evidence was presented regarding Heinemann's conduct involving M.L. The jury found Heinemann guilty on both counts.

5

Following Heinemann's conviction in Docket 24, No. 474, the State filed notice, in Docket 24, No. 491 of its intent to seek sentence enhancement pursuant to [Wyoming's habitual criminal statute,] Wyo. Stat. Ann. § 6-10-201 (Lexis 1999). In that case, the trial court issued an order stating that evidence of Heinemann's conduct with M.L. was not admissible, but the other four prior bad acts were admissible. The trial began on June 3, 1998. The jury heard evidence of the assaults on S.L. and M.M., but the trial court ruled during the trial that it would not allow evidence concerning A.T. and R.F. The jury acquitted Heinemann of attempted first-degree sexual assault, but convicted him of third-degree sexual assault upon A.G.

The trial court combined the sentencing proceedings in the two cases. In Docket 24, No. 474, the trial court sentenced Heinemann to six months confinement on the conviction for furnishing alcohol to a minor, and six to eight years for the immoral acts with a minor conviction. In Docket 24, No. 491, the trial court imposed a life sentence without possibility of parole, pursuant to Wyo. Stat. Ann. § 6-2-306(d) [the habitual criminal statute].

Heinemann I, 12 P.3d at 695-97.

*Heinemann's direct appeal*

Heinemann, represented by the Wyoming Public Defender's Office, appealed his convictions and sentences to the WSC, raising the following three issues:

1. Whether the inclusion of attempted sexual assault for sentencing enhancement via Wyo. Stat. Ann. § 6-3-306 was error?

2. Whether the district court deprived him of his right to due process and a fair trial when it failed to establish 404(b) evidence by clear and convincing evidence?

3. Whether his right to due process and a fair trial was violated by the admission of the 404(b) evidence?

The WSC affirmed Heinemann's convictions and sentences in a published opinion issued on October 26, 2000. Heinemann I, 12 P.3d at 702. The United States Supreme

6

Court subsequently denied Heinemann's petition for writ of certiorari. Heinemann v. Wyoming, 532 U.S. 934 (2001).

*Heinemann's state post-conviction efforts*

On January 15, 2002, Heinemann filed a petition for writ of review with the WSC raising three issues: (1) whether he had effectively been denied his right to appeal his convictions pursuant to Wyo. Stat. Ann. § 7-12-101[2] as a result of the court reporter's failure to provide a complete transcript and the failure of his appellate counsel to notice that the record on appeal was incomplete; (2) whether he had been deprived of his right to the effective assistance of counsel on appeal; and (3) whether the interests of justice and judicial economy required the WSC to permit him a new opportunity to appeal his convictions. The WSC, on February 5, 2002, denied Heinemann's petition. In doing so, the WSC concluded that Heinemann's claim of ineffective assistance of appellate counsel should be pursued in accordance with Wyoming's post-conviction relief statute. It also noted that the state district court would be in a better position, in the first instance, to determine which transcripts were omitted from Heinemann's direct appeal.

Heinemann, in accordance with the WSC's suggestion, filed a petition for post-conviction relief in state district court on February 11, 2002. In connection with that petition, Heinemann sought to obtain a complete trial court transcript. After receiving

---

[2] Section 7-12-101, entitled "Manner of appeal," provides:
A defendant may appeal his conviction in any criminal case in the manner provided by the Wyoming Rules of Appellate Procedure and the Wyoming Rules of Appellate Procedure for Courts of Limited Jurisdiction.

7

additional transcripts, Heinemann, with the approval of the state district court, filed an amended petition raising the following issues: (1) whether the absence of a complete record on direct appeal amounted to a denial of effective assistance of appellate counsel; (2) whether he was denied his confrontation right to cross-examine and impeach all opposing witnesses; and (3) whether the prosecutor violated his due process rights by improperly suppressing material exculpatory evidence.

The state district court held a hearing on the matter and, on May 19, 2006, denied Heinemann's petition. On June 28, 2006, the WSC denied Heinemann's petition for review.

*Heinemann's federal habeas proceedings*

On June 30, 2006, Heinemann, represented by attorneys with the Defender Aid Program at the University of Wyoming College of Law, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied Heinemann's petition on February 25, 2008. On that same date, the district court entered judgment against Heinemann.

Heinemann filed a notice of appeal on March 24, 2008. On November 14, 2008, this court issued an order granting Heinemann a certificate of appealability with respect to five issues: (1) whether Heinemann's due process rights were violated when his direct appeal was litigated and decided without his appellate counsel or the WSC having access to a complete record of the trial proceedings; (2) whether Heinemann's appellate counsel was ineffective for failing to acquire and review a complete record of the trial

8

proceedings; (3) whether Heinemann's due process and confrontation rights were violated by the state trial court's decision precluding him from cross-examining the state's juvenile witnesses concerning their prior contacts with law enforcement or juvenile probation status; (4) whether Heinemann's due process and confrontation rights were violated by the state trial court's decision prohibiting him from cross-examining A.T., the victim of his indecent liberties with a minor conviction, regarding prior statements she made to law enforcement officers about the crime; and (5) whether Heinemann's due process rights were violated when the state prosecutor withheld information which, according to Heinemann, would have undermined the credibility of A.G., the victim of the October 16, 1997 sexual assault.

## II

Our review of Heinemann's appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of

9

federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

## III

### *Insufficiency of record on direct appeal*

The record presented to the WSC in connection with Heinemann's direct appeal was missing five sections: a pretrial motion to suppress Rule 404(b) evidence; the transcript of the voir dire proceedings; an addendum to volume I of the trial transcript that would have contained discussion regarding the extent to which defense counsel could cross-examine the juvenile witnesses about prior contacts with law enforcement; an addendum to volume II of the trial transcript that would have contained discussion regarding defense counsel's desire to question one of the juveniles about her interview

10

tape with police; and the verdict and discharge of the jury. Heinemann argues that, as a result of these missing sections, his right to due process on direct appeal was violated.

*a) Clearly established federal law*

Heinemann identifies three cases as providing the clearly established federal law applicable to his claim: Griffin v. Illinois, 351 U.S. 12 (1956), Mayer v. City of Chicago, 404 U.S. 189 (1971), and Evitts v. Lucey, 469 U.S. 387 (1985).

In Griffin, two indigent criminal defendants asked an Illinois state court to provide them with transcripts of their trial proceedings free of cost. 351 U.S. at 13. Under Illinois law, the state paid for trial transcripts only in capital cases and the court therefore denied their request. Id. at 15. The Supreme Court ruled that the state's refusal to provide indigent defendants with trial transcripts deprived the defendants of adequate appellate review. Id. at 18. Because the Illinois court system gave meaningful appellate review to those defendants who could afford transcripts but not to those who could not, the Supreme Court held that the state scheme violated the right of indigent defendants to equal protection. Id. at 19-20.

Nearly thirty years later, in Evitts, the Supreme Court explained that the state's denial of free transcripts in Griffin "violated due process principles because it decided the appeal in a way that was arbitrary with respect to the issues involved." 469 U.S. at 404. As a result of Griffin and Evitts, it is now settled that if states provide transcripts for appeals from convictions in criminal cases, the due process and equal protection clauses of the Fourteenth Amendment require that the right shall not be limited to those who are

11

able to afford the expense of an appeal.

In applying this standard, the Supreme Court has noted that criminal defendants must be afforded a "record of sufficient completeness to permit proper consideration of their claims."  Draper v. Washington, 372 U.S. 487, 499 (1963).  "A 'record of sufficient completeness,'" the Supreme Court has explained, "does not translate automatically into a complete verbatim transcript."[3]  Mayer, 404 U.S. at 194.

*b) The state district court's rejection of Heinemann's claim*

Heinemann raised this same claim, i.e., that his due process rights were violated as a result of the missing portions of his trial transcript, in his petition for state post-conviction relief.  The state district court, in analyzing Heinemann's claim, reviewed Evitts, Mayer, and Britt v. North Carolina, 404 U.S. 226 (1971).  In Britt, the defendant's three-day murder trial in a state court ended in a hung jury and a mistrial.  The defendant was tried a month later and convicted.  The defendant was indigent, and in the interim between trials asked for a free transcript of the first trial.  The request was denied.  The Supreme Court, after noting that Griffin would generally require the provision of a transcript, affirmed because the record did not reveal sufficient need for the transcript and the defendant's counsel had an available alternate device which was the substantial

---

[3] To be sure, however, the Supreme Court stated in Mayer that a full transcript must still be provided whenever it "is necessary to assure the indigent as effective an appeal as would be available to the defendant with resources to pay his own way."  404 U.S. at 195.

equivalent of a transcript.[4]  In the course of its decision, the Supreme Court held that two

factors were relevant to the determination of need: (1) the value of the transcript to a

defendant in connection with the trial for which it is sought, and (2) the availability of

alternative devices that would fulfill the same function as a transcript.  404 U.S. at 227.

The state district court ultimately concluded that "[t]he unavailability of portions

for appeal did not prejudice [Heinemann's] direct appeal and" that "the overall record

d[id] not . . . indicate the probability of a miscarriage of justice."  App. at 90.  More

specifically, the state district court concluded it was "highly unlikely" "[t]hat there was a

miscarriage of justice attributable to the state of the record" at the time of Heinemann's

direct appeal.  Id.

c) Did the state district court unreasonably apply clearly established federal law?

We are not persuaded that the state district court's resolution of this claim was

contrary to, or an unreasonable application of, clearly established Supreme Court

precedent.  To begin with, there is no indication that the missing portions of Heinemann's

direct appeal record were the result of indigency, as was the case in Griffin.  Neither

could there be; Heinemann has never claimed indigency.  In fact, the record indicates that

the missing portions were attributable to the fact that Heinemann's trial was "taken down

---

[4] Specifically, the Court noted that the petitioner in Britt "could have obtained
from the court reporter far more assistance than that available to the ordinary defendant,"
because "[t]he trials of th[e] case took place in a small town where . . . the court reporter
was a good friend of all the local lawyers," "was reporting the second trial," and "would
at any time have read back to counsel his notes of the mistrial, well in advance of the
second trial, if counsel had simply made an informal request."  404 U.S. at 229.

and transcribed by a substitute court reporter arranged by the official reporter." App. at 87. Further, Heinemann has failed entirely to establish that the missing portions of the record had any impact on the WSC's resolution of the issues that were actually presented on direct appeal. Finally, to the extent that Heinemann contends that the missing portions of the record could have given rise to meritorious issues on direct appeal, we conclude that contention is more properly considered in the context of his ineffective assistance of appellate counsel claim.

*Ineffective assistance of appellate counsel*

Heinemann next contends that his counsel on direct appeal was ineffective for failing to notice the missing portions of the record and acquire a complete trial transcript. According to Heinemann, "appellate counsel's woeful performance calls into serious question any judgment she exercised in selecting issues to include in the brief or judgments she might have exercised if she had the complete record." Aplt. Br. at 19. Indeed, Heinemann suggests that appellate counsel "failed to bring several claims . . . which had a reasonable probability to alter the outcome of the appeal." Id. at 31. In particular, Heinemann contends that "the factual bases for claims II, III and IV of [his federal] habeas petition were" contained in the missing portions of the direct appeal record and "[t]hese claims, if they had been raised, had at least a reasonable probability to alter the outcome of the appeal." Id. at 30.

*a) Clearly established federal law*

The "clearly established federal law" applicable to this claim is the Supreme

Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In <u>Strickland</u>, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." 466 U.S. at 687. "First," the Court noted, "the defendant must show that counsel's performance was deficient." <u>Id.</u> "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." <u>Id.</u> "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." <u>Id.</u>

### b) The state district court's rejection of Heinemann's claim

Heinemann first raised his ineffective assistance claim in his petition for state post-conviction relief. The state district court, citing <u>Strickland</u> and several other cases, rejected the claim on the merits. In doing so, the state district court concluded that "there [wa]s not a reasonable probability that, but for appellate counsel's failure to notice the incompleteness of the record, the result of the proceedings would have been different." App. at 99. In reaching this conclusion, the state district court considered and rejected as lacking in merit the potential issues identified by Heinemann in the missing portions of the direct appeal record. Thus, the state district court concluded that Heinemann had

15

failed to satisfy the prejudice prong of Strickland.

   *c) Was the state district court's decision contrary to Strickland?*

   After examining the record on appeal, we conclude that the state district court's decision was neither contrary to, nor an unreasonable application of, Strickland. Assuming, for purposes of argument, that the performance of Heinemann's appellate counsel was deficient to the extent she failed to notice and obtain the missing portions of the record, we are unpersuaded that Heinemann was prejudiced by those deficiencies. Although Heinemann asserts that obtaining the missing portions of the record would have allowed his appellate counsel to assert on direct appeal three of the substantive issues that he later asserted in his federal habeas petition, we conclude that all three of those issues were identifiable from the portions of the record actually available to Heinemann's appellate counsel.[5] More importantly, we conclude that none of the three issues now identified by Heinemann were so clearly meritorious that they warranted inclusion among the issues asserted on direct appeal. See Cargle v. Mullin, 317 F.3d 1196, 1202 & n.4

---

   [5] For example, Heinemann argues that, because the record on direct appeal was missing the transcript of the proceeding wherein the trial court limited defense counsel's ability to cross-examine the juvenile defendants about their prior contacts with law enforcement, his appellate counsel could not have made an informed decision whether to raise the issue. However, the record on direct appeal referenced the trial court's ruling that defense counsel could not cross-examine T.T. regarding T.T.'s prior contact with law enforcement. See Supp. App. at S000015-16 (Tr. Transcript, March 16, 1998 at 60-61) (statement from the prosecutor that defense counsel was "dangerously close to talking about her prior contacts with law enforcement and I think you specifically said that it wasn't admissible"). The state district court concluded in addressing Heinemann's petition for post-conviction relief, and we agree, that this reference in the direct appeal record was sufficient to have alerted Heinemann's appellate counsel to the issue and to have allowed the issue to be presented on direct appeal.

16

(10th Cir. 2003) (discussing how strong an omitted issue must be to warrant a conclusion that a defendant was prejudiced by counsel's failure to assert it on appeal).  Indeed, we declined to grant Heinemann a COA in order to challenge the district court's rejection of one of those claims (Claim IV of his federal habeas petition, in which he asserted a denial of his due process and confrontation rights resulting from the state trial court's decision to admit a police officer's preliminary hearing testimony recounting statements made to him by a juvenile witness regarding a prior bad act by Heinemann), and, as outlined in greater detail below, we conclude the other two claims lack merit.

*Limitation on cross-examination of juvenile witnesses*

Heinemann contends that his due process and confrontation rights were violated by the state trial court's decision precluding him from cross-examining the state's juvenile witnesses, particularly T.T., concerning their prior contacts or juvenile probation status in order to show bias, lack of credibility, or motivation to lie.

*a) Clearly established federal law*

Heinemann identifies Davis v. Alaska, 415 U.S. 308 (1974), as providing the "clearly established federal law" applicable to this claim.  In Davis, the Supreme Court "granted certiorari . . . to consider whether the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as [a] juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications

17

of delinquency." 415 U.S. at 309. In the case before it, the prosecution's key witness was an individual who, both at the time of trial and at the time of the events he testified about, "was on probation by order of a juvenile court after having been adjudicated a delinquent for burglarizing two cabins." Id. at 311. Defense counsel sought to cross-examine this witness regarding his juvenile adjudication, not as a general impeachment of his character, but rather "to show specifically that at the same time [he] was assisting the police in identifying petitioner he was on probation for burglary," and thus "acted out of fear or concern of possible jeopardy to his probation." Id. The trial court, however, granted the prosecution's motion for a protective order, relying on an Alaska statute that placed strict limitations on the admissibility in court of an "adjudication, order, or disposition of a juvenile case . . . ." Id. at 311 n.1. On direct appeal, the Alaska Supreme Court affirmed the petitioner's convictions, "concluding . . . it did not have to resolve the potential conflict in th[e] case between a defendant's right to a meaningful confrontation with adverse witnesses and the State's interest in protecting the anonymity of a juvenile offender since [its] reading of the trial transcript convince[d] [it] that counsel for the defendant was able adequately to question the youth in considerable detail concerning the possibility of bias or motive." Id. at 314-15 (internal quotation marks omitted).

The United States Supreme Court disagreed with the Alaska Supreme Court's "interpretation of the Confrontation Clause and . . . reverse[d]." Id. at 315. In doing so, the Court noted that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," and that "[o]ne way of

18

discrediting the witness is to introduce evidence of a prior criminal conviction of that witness." Id. at 316. Further, the Court noted that "[a] more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Id. Based upon these principles, the Court concluded that "[t]he claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness'] vulnerable status as a probationer," id. at 317-18, and it rejected "the Alaska Supreme Court's conclusion that the cross-examination that was permitted defense counsel was adequate to develop the issue of bias properly to the jury." Id. at 318. Further, the Court concluded "that the right of confrontation" in this setting "[wa]s paramount to the State's policy of protecting a juvenile offender" because "[w]hatever temporary embarrassment might result to [the witness] or his family by disclosure of his juvenile record – if the prosecution insisted on using him to make its case – [wa]s outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness." Id. at 319.

        b) *The state district court's rejection of Heinemann's claim*

        Heinemann first raised this issue in his petition for post-conviction relief. The state district court rejected it on the merits, stating, in pertinent part:

        There is a procedure commonly followed by this Court to determine the admissibility of records which are statutorily confidential, as authorized by Gale v. State, 792 P.2d 570 (Wyo. 1990). The procedure is for counsel to

19

subpoena the records.  On motion to quash the subpoena the Court orders the records to be delivered for in-camera inspection.  If the Court is satisfied upon such inspection that any of the material in the records is material then defense counsel are entitled to it.  At no time did the defense attempt to subpoena the Juvenile Court records, if there are such records, and therefore there was no in-camera inspection or ruling on the materiality of any records.

The transcripts of the pretrial motions and some during the trial are complete and contain no indication of any defense motion for access to the witnesses' Juvenile Court records.

App. at 94.

*c) Was the state district court's decision contrary to* Davis*?*

We readily conclude that the state district court's decision was neither contrary to, nor an unreasonable application of, the Supreme Court's decision in Davis.  Although the state district court did not directly cite to the Supreme Court's decision in Davis, it did cite to the Wyoming Supreme Court's decision in Gale, which itself discussed the requirements on cross-examination imposed by Davis and its progeny.  Most importantly, the state district court properly distinguished Heinemann's case from Davis on the grounds that Heinemann's counsel made no attempt prior to trial to obtain the juvenile records (if any) of the prosecution's witnesses, and thus Heinemann had no concrete basis on which to claim, and the state trial court had no concrete basis on which to conclude, that cross-examination of the witnesses regarding their juvenile histories (if any) would have been potentially fruitful.

It is also worth mentioning, as the state district court did in a later portion of its order denying Heinemann's petition for post-conviction relief, that a review of the

20

transcript of T.T.'s cross-examination indicates that, when the prosecution objected to defense counsel possibly questioning T.T. regarding "her prior contacts with law enforcement," Aplee. App. at 15, defense counsel stated, "I don't want to get into the records. I want to get into their awareness of talking with officers and ability to lie with officers or those kind of things." Id. at 16. In turn, the state trial court allowed defense counsel to pursue this very line of questioning with T.T., id. at 16-17, and T.T. admitted she had spoken with law enforcement officers before and was aware that it was a crime to provide them with false information. Id. at 15-17. Even aside from defense counsel's failure to subpoena the witnesses' juvenile records, these facts render Heinemann's case factually distinguishable from Davis.

*Limitation on cross-examination of A.T.*

Heinemann asserts that his due process and confrontation rights were violated when the state trial court prohibited him from cross-examining A.T., the victim of his indecent liberties with a minor conviction, about prior statements she made to law enforcement officers regarding the alleged incident that gave rise to the indecent liberties with a minor conviction.

*a) Clearly established federal law*

Heinemann identifies Davis and Douglas v. Alabama, 380 U.S. 415 (1968), as providing the "clearly established federal law" applicable to this claim. In Douglas, the Supreme Court "decide[d]," for the first time, "that the Confrontation Clause of the Sixth Amendment is applicable to the States." 380 U.S. at 418. Other than the applicability of

21

that basic holding to Heinemann's case, since Heinemann was tried in state court, the facts of Douglas are materially distinguishable and thus not worth repeating here.

*b) The state district court's rejection of Heinemann's claim*

Heinemann first raised this claim in his petition for state post-conviction relief. The state district court denied the claim on the merits, stating:

> The victim's testimony was attacked by defendant on the grounds that she audaciously lied to the police and others immediately after the incident, which she freely admitted. She apparently gave another, recorded, statement the following day in which she continued some, if not all, of her untrue statements. It is equally clear, however, that the cross-examination of [A.T.] together with the testimony and cross-examination of the other witnesses amply and conclusively demonstrated to the jury that all of the minors lied to the police when first questioned, but later told the truth, they claimed, consistent with their trial evidence when they realized that the police knew that they were lying. It is clear in the record that the defendant successfully put before the jury the fact that in this next-day statement [A.T.] was able to recall some things which she professed an inability to recall at trial. The testimony of police officer Glenda Frank confirmed it. It was repeatedly and forcefully put to the jury's attention in both cross-examination and in argument that the minors lied and that [A.T.] especially blatantly lied claiming that she had been raped. There were also, as noted, discrepancies among the recollections of the several minors who were witnesses. These discrepancies were thoroughly developed by the defense.
>
> In view of the above, it scarcely seems material that the Court might have made some previous ruling concerning [A.T.]'s recorded statement to the police. The essence of it is that she initially lied to the police and to the medical personnel, she professed an inability to recall the critical incident in her trial testimony, and that assertion on her part was attacked by the defense as being inconsistent with the fact that in her next-day statement she recalled more than she claimed to recall at trial. It's difficult to see how those relevant facts could have been any better demonstrated or elaborated upon than they actually were.

App. at 92-93.

*c) Was the state court's decision contrary to <u>Davis</u> or <u>Douglas</u>?*

Before assessing the state district court's resolution of this issue, we pause to briefly review the events relevant to this issue that transpired during Heinemann's trial. On direct examination by the prosecutor, A.T. testified that she and her friends encountered Heinemann, went to his apartment, and began to drink alcohol. A.T. testified that, after drinking some alcohol, the next thing she remembered was waking up in the hospital. Aplee. Supp. App. at 66. At the outset of cross-examination, defense counsel asked A.T, "[Y]our testimony is you cannot recall anything that happened in that apartment, basically?" <u>Id.</u> at 67. A.T. responded, "Yeah." <u>Id.</u> Defense counsel then asked A.T. if she recalled speaking with Detective Glenda Frank after the incident. <u>Id.</u> A.T. responded that she did not recall that at all. <u>Id.</u> Defense counsel then requested a recess so he could "set up the interview tape between [A.T.] and Ms. Frank . . . so we can talk about some of the things that [A.T.] did tell the officer on that interview." <u>Id.</u> at 69. The prosecutor objected, arguing that A.T. "testified she doesn't remember talking to the officer," <u>id.</u>, so it would not be useful "to listen to the [interview] tape." <u>Id.</u> at 70. The state trial court sustained the objection, stating, "Well, she's testified that she has no recollection of it [the interview], so the objection is sustained." <u>Id.</u> The state trial court did, however, acknowledge defense counsel's right to question Detective Frank about the interview and A.T.'s answers. <u>Id.</u> At the conclusion of the cross-examination of A.T., defense counsel renewed his request to play for the jury the interview tape between A.T. and Detective Frank. App. at 152. The state trial court ultimately granted the request,

23

agreeing with the prosecutor that the tape was admissible under Wyoming Rule of Evidence 803(5) as a recorded recollection. Id. at 152-53, 159. The state trial court refused, however, to allow defense counsel to further cross-examine A.T. after the tape was played. Id. at 164.

After the jury heard the tape of Detective Frank's interview with A.T., the prosecution presented the testimony of Detective Frank. On direct examination, Frank testified that she did not attempt to interview A.T. at the hospital immediately after the incident because A.T. "was too intoxicated." Aplee. Supp. App. at 97. Frank testified, however, that she later conducted a taped interview with A.T. Id. at 100. On cross-examination, Frank testified that A.T. had told another officer after the incident (but prior to Frank's interview with her) that "she had been forced to drink and raped by a man named Tony." Id. at 113-14. Later during cross-examination, Frank testified that she spoke with A.T. "and she didn't recall what had happened." Id. at 117. Frank acknowledged that A.T. had informed a doctor at the hospital immediately after the incident that "she was raped vaginally and rectally." Id. at 118. Frank also acknowledged that A.T.'s responses during her interview were "a lot more detailed" than her testimony in court. Id. at 130.

These facts clearly confirm the state district court's observations and, in our view, firmly establish that the state district court's rejection of Heinemann's post-conviction claim for relief was neither contrary to, nor an unreasonable application of, either Davis or Douglas. Although the state trial court sustained the prosecution's objection to defense

24

counsel attempting to impeach A.T. by playing her interview tape with Detective Frank, we are doubtful that this ruling was improper, given A.T.'s testimony that she did not recall speaking with Detective Frank. Moreover, even assuming the ruling was erroneous and thereby violated Heinemann's Sixth Amendment confrontation rights, we are persuaded the error was harmless beyond a reasonable doubt because the audiotaped interview between A.T. and Detective Frank was played for the jury, and defense counsel was able to fully cross-examine Detective Frank regarding A.T.'s post-incident statements.[6] See Brecht v. Abrahamson, 507 U.S. 619, 653 (1993) (recognizing that "Confrontation Clause violations are subject to harmless-error review").

## Brady *violation*

Lastly, Heinemann contends that his due process rights were violated when the prosecutor withheld information which, he contends, would have undermined the credibility of witness A.G., who testified regarding a W.R.E. 404(b) incident. This information, Heinemann asserts, indicated that A.G. "previously had made rape allegations against another man only to later admit that she made them up." Aplt. Br. at 46.

### a) Clearly established federal law

Heinemann identifies Brady v. Maryland, 373 U.S. 83 (1963) and its progeny as the "clearly established federal law" applicable to his claim. In Brady, the Court held

---

[6] Although the Supreme Court in Davis concluded that the infringement on the defendant's confrontation rights in that case was not harmless, the facts of Davis are materially distinguishable from Heinemann's case.

25

"that the suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution." Id. at 87.

b) *The state district court's rejection of Heinemann's claim*

Heinemann first raised this claim in a motion for new trial filed with the state trial

court. The state trial court rejected the claim on the merits, stating as follows:

> One of the 404(b) witnesses [at trial] was [A.G.,] a seventeen-year old female who was also the victim in another offense of which defendant was later convicted (Docket 24-491) in a jury trial after the one at issue here. Her testimony in the later trial was essentially the same as her 404(b) testimony in this case.

> In the course of the later trial it developed, as discovered during defense counsel's preparations for trial, that the witness in question had on a prior occasion reported to the Laramie County Sheriff's Office that she had been sexually assaulted. The investigating Sheriff's deputies having some familiarity with the young woman and looking into her allegations, believed them to be unsubstantiated and say that she so admitted. Because of this determination the Sheriff's office did not convey any information about the reported incident to the District Attorney's office.

> Because neither the District Attorney or defense counsel knew of the incident, it did not come to light in the indecent liberties trial. But, defendant learned of it and informed the District Attorney of it prior to the second trial. Therefore, the defense has raised the issue by way of motion for new trial under Rule 33, W.R.Cr.P.

> Defendant claims the nondisclosure to him of the accusation and its apparent falsity require a new trial or dismissal on the authority of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963) and *Engberg v. State*, 820 P.2d 70 (Wyo. 1991). The right of the defendant to be advised of all exculpatory evidence, including impeachment evidence, as a matter of due process and the corresponding obligation of the state to make disclosure are well settled and not disputed here. The defendant also cites *Smith v. Secretary*, 50 F.3d 801 (10th Cir. 1995) and other cases that the state's good

26

faith is not relevant. In this case, counsel concedes that the District Attorney did not know of the incident, having not been informed of it by the Sheriff's Office, until he was informed by the defense attorney. But he argues that the state, including the Sheriff's office, has an affirmative duty to disclose. Nevertheless, the information in this case was not suppressed by the state in any but a very constructive way. That is, only if mere inadvertent nondisclosure is deemed to be suppression, was there suppression.

The parties agree that under the cases, including *Spencer v. State*, 925 P.2d 994 and *Relish v. State*, 860 P.2d 455, the movant here in order to prevail on the motion must show that (1) the prosecution suppressed evidence; (2) the evidence would have been favorable to him; and (3) that the evidence was material. As indicated above, the evidence is that the information was not suppressed but was not disclosed by the state.

The information in question here was favorable to the defendant as it went to the credibility of a "404(b)" witness, even though it's true as argued by the state that the witness's specific testimony at trial was not seriously disputed. The favorability is present but marginal. The Court recognizes that, as the defendant argues, the facts were such that the state's case was not powerful on the indecent liberties count. But the defendant's argument was that if he touched the victim's breasts it was inadvertent when he prevented her falling in her state of intoxication. His motive and intent were principally at issue and the witness's testimony went to those elements.

The cases cited by the parties and particularly those cited by [defense counsel] on the third page of his memorandum concern the element of materiality. In this case, as indicated above, the factual issue was principally, if the defendant touched the victim as alleged, was it with the requisite intent for an indecent liberties conviction? There was much evidence on this issue with which the jury could have made the determination, including the entire context; young people taken to the apartment, alcohol supplied, "strip-poker" started, all by an adult, a stranger to the young people. [A.G.]'s 404(b) testimony also went to that issue, but it seems highly improbable that the additional cross-examination of her on the prior rape accusation would alter the jury's verdict. Hence, while the evidence was relevant and favorable to the defendant, it was not material in the sense required.

App. at 63-64.

Heinemann did not directly appeal the state trial court's denial of his motion for new trial. Instead, he reasserted the issue in his petition for state post-conviction relief. The state district court did not address the claim in denying Heinemann's petition.[7]

*c) Was the state trial court's decision contrary to Brady?*

We conclude that the state trial court's ultimate conclusion was neither contrary to, nor an unreasonable application of, Brady. The state trial court's decision properly identified Brady as the controlling precedent, and likewise correctly identified the specific requirements a criminal defendant must satisfy in order to establish a Brady violation. As for its analysis of those requirements, the state trial court, which was intimately familiar with the evidence presented against Heinemann and the likely impact of any exculpatory evidence, reasonably concluded that the exculpatory evidence now pointed to by Heinemann was not material.[8] See Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (noting that evidence is material, for purposes of Brady, "if there is a reasonable

_____

[7] Respondent argued below that the claim was procedurally barred, but the federal district court concluded that Heinemann had established cause, i.e., ineffective assistance of appellate counsel, for failing to raise it on direct appeal. Although we question whether this conclusion was correct, respondent does not argue, and thus appears to have waived for purposes of appeal, the issue of procedural bar.

[8] We do take issue with the state trial court's suggestion that an inadvertent nondisclosure might not constitute "suppression" for Brady purposes. In Strickler v. Greene, 527 U.S. 263, 288 (1999), the Supreme Court made clear that, "under Brady, an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment." Because, however, the state trial court simply assumed that the prosecution had suppressed the evidence and proceeded to properly analyze the materiality issue, we find no basis for granting federal habeas relief on this claim.

28

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").  As noted by the state trial court, it appears highly doubtful, given the other evidence presented by the prosecution, that the defense's cross-examination of A.G., a "WRE 404(b)" witness, would have altered the outcome of the trial.  Thus, Heinemann has failed to establish his entitlement to federal habeas relief on the basis of his Brady issue.

       AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge